UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL ELEVATOR BARGAINING ASSOCIATION, and SCHINDLER ELEVATOR CORP., <br> Plaintiffs; <br><br> v. <br><br> INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, DANA BRIGHAM, Individually and as General President, JAMES HIGGINS, Individually and as Assistant to the General President, MICHAEL LANGER, Individually and as Regional Director; LOCAL 14, INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, DONALD M. WINKLE, JR., Individually and as Business Representative, and all others conspiring, acting in concert or otherwise participating with them or acting in their aid or behalf, <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CIVIL ACTION NO. |

## VERIFIED COMPLAINT

### THE PARTIES

1.      Plaintiff National Elevator Bargaining Association ("NEBA") is a multi-employer trade association incorporated under the laws of the State of Delaware with its principal office at 362 Cedar Lane, Teaneck, New Jersey. NEBA is the representative for collective-bargaining purposes for employer-members who are engaged in the business of constructing, modernizing, repairing and maintaining elevators, escalators, dumbwaiters, moving walkways and similar

DOWNS
RACHLIN
MARTIN PLLC

devices for third parties such as building owners and general contractors in every state of the United States, including New York.

2. Plaintiff Schindler Elevator Corp. ("Schindler"), a Delaware corporation, with its headquarters located in Morristown, New Jersey, and offices in other locations throughout the United States, including Williamsville, New York, is engaged in the business of constructing, modernizing, repairing and servicing elevators escalators, and related equipment throughout the United States, including New York. Schindler is one of the employer-members of NEBA and is represented by NEBA for purposes of collective bargaining.

3. Schindler employs elevator constructor Mechanics, Assistant Mechanics, Helpers and Apprentices represented by Defendant the International Union of Elevator Constructors (the "IUEC") and Defendant IUEC Local No. 14 ("Local 14").

4. This is an action to enjoin a work stoppage and other interferences with Schindler's operations in violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce, as defined in the Labor Management Relations Act, 29 U.S.C. § 141 et seq. This Court has jurisdiction of this action pursuant to 29 U.S.C. § 185(a).

5. Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(1) & (2).

6. Schindler and NEBA are employers within the meaning of Section 2(2) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152(2).

7. Defendant IUEC, which has a principal place of business at 7154 Columbia Gateway Drive, Columbia, MD 21044, is the exclusive collective-bargaining representative of elevator constructor Mechanics, Helpers and Apprentices, for and on behalf of its local unions,

DOWNS
RACHLIN
MARTIN PLLC

2

123494.1

including Defendant Local 14, which has a principal place of business at 3527 Harlem Road, Suite 9, Buffalo, New York 14225. Local 14 represents elevator constructor Mechanics, Assistant Mechanics, Helpers and Apprentices employed by Schindler in the Buffalo, New York region.

8.    Defendant Dana Brigham is General President of the IUEC.

9.    Defendant James Higgins is Assistant General President of the IUEC.

10.    Defendant Michael Langer is an IUEC Regional Director for a region that includes Buffalo, New York.

11.    Defendant Donald M. Winkle, Jr. is Local 14's Business Representative.

12.    The IUEC and Local 14 are labor organizations within the meaning of Section 2(5) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152(5).

## THE COLLECTIVE-BARGAINING AGREEMENT

13.    For many years prior to 2002, the IUEC entered into a series of five-year collective-bargaining agreements with the National Elevator Industry, Inc. ("NEII"), a multi-employer bargaining group of which Schindler was a member. The IUEC-NEII contracts were referred to as the Standard Agreements. The last Standard Agreement was effective from July 9, 1997 to July 8, 2002.

14.    In 2002 Schindler and other elevator companies withdrew from NEII for purposes of collective bargaining. Schindler negotiated its own collective-bargaining agreement with the IUEC which had a term of July 9, 2002 to July 8, 2007. The IUEC entered into substantially similar agreements of identical duration with other former NEII members including but not limited to Otis Elevator Company ("Otis"), KONE, Inc. ("KONE") and ThyssenKrupp Elevator

Company ("Thyssen"). The IUEC characterized these agreements as identical, and referred to them collectively as the "Master Agreement."

15.    In 2007, NEBA for and on behalf of Schindler and its other employer-members, negotiated a collective-bargaining agreement with the IUEC for and on behalf of its affiliated local unions, including Local 14 (the "NEBA Agreement"), which has a term of July 9, 2007 to July 8, 2012. A copy of the NEBA Agreement is attached hereto as Exhibit A.

16.    The NEBA Agreement covers the terms and conditions of employment of Elevator Constructor Mechanics, Assistant Mechanics, Apprentices and Helpers employed by Schindler in New York except for New York City and vicinity which is covered by a separate agreement with IUEC Local 1.

17.    Article XIV of the NEBA Agreement, like the predecessor agreements, expressly prohibits strikes during the term of the Agreement. It provides in pertinent part:

> **Par. 1.** It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party. It is understood that this Paragraph shall be applied and construed consistent with the provisions of Article IV, Par. 11 concerning Grievance and Arbitration procedure.
>
> **Par. 2.** No strike will be called against the Company by the Union unless the strike is approved by the International Office of the International Union of Elevator constructors. Sufficient notice shall be given to the Company before a strike shall become effective. Except in the case of Contract Service Work as specified in Article IX of this Agreement, work stoppages brought about by lawful picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.
>
> **Par. 3.** In the event of a strike, work stoppage or lockout affecting Mechanics, Helpers and Apprentices on New

DOWNS
RACHLIN
MARTIN PLLC

4

123494.1

> Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout, and the Union will supply competent men to the Company to do all work covered under Contract service whether such men are continuously employed in this work or not prior to the strike, work stoppage or lockout.

18. Article IV, Par. 1 of the NEBA Agreement defines the work that is to "be performed exclusively by Elevator Constructor Mechanic, Elevator Constructor Helpers and Elevator Constructor Apprentices in the employ of the Company."

19. Article IV, Par. 9 of the NEBA Agreement states "[n]o restrictions shall be imposed as to methods, tools or equipment used."

20. Article IV, Par. 11 of the NEBA Agreement requires that "[a]ll differences and disputes concerning Article IV or Article IV(A) shall be settled in accordance with the grievance procedures in Article XV."

21. Article XV of the NEBA Agreement further requires that "[a]ny difference or dispute regarding the application and construction of this Agreement" shall be resolved under the grievance/arbitration procedure set forth in the Agreement, which provides for final and binding arbitration by an impartial arbitrator.

22. The IUEC has asserted grievances on numerous occasions alleging, inter alia, that employers violated the collective-bargaining agreement by assigning bargaining-unit work to non-bargaining unit employees. Attached hereto as Exhibits B, C, D and E are copies of grievances asserted by the IUEC alleging that the employer violated Article IV of the collective-bargaining agreement by assigning certain work to non-bargaining unit employees. Attached hereto as Exhibit F is a copy of an arbitrator's award arising from an IUEC grievance contending

DOWNS
RACHLIN
MARTIN PLLC

5

123494.1

that IUEC-represented employees were improperly deprived the work of installing rail bracket extensions.

## THE UNDERLYING DISPUTE AND
## THE UNLAWFUL WORK STOPPAGE

23.    Schindler has a contract with General Contractor L.P. Ciminelli to install three Schindler Model 400A elevators at a parking facility under construction at 134 High Street MMTS in Buffalo, New York.  L.P. Ciminelli is the largest construction company in the greater-Buffalo area and an important customer for Schindler.  The owner of the building under construction at 134 High Street is Kaleida Health.

24.    Schindler's work on the project is time-sensitive.  Kaleida Health has imposed a strict deadline of March 23, 2012 for completion of one fully operational elevator.  The strict deadline is achievable with overtime as long as there are no unplanned work interruptions.

25.    Schindler's contract with L.P. Ciminelli specifies site conditions that L.P. Ciminelli is to provide before Schindler's work in elevator shafts (or "hoistways") can begin. The specifications include hoistway walls that are nearly if not perfectly vertical (or "plumb"). The General Contractor also needs to provide Schindler a temporary work platform at the top of the hoistway, on which Schindler employees stand while installing the elevator drive machine and other equipment.

26.    In approximately mid-January 2012, L.P. Ciminelli's Project Manager informed Schindler that the walls of the hoistways – to which the rails that guide the elevator as it travels up and down are attached – are not sufficiently plumb.

DOWNS
RACHLIN
MARTIN PLLC

123494.1

27. To address this, Schindler initially planned to direct employees to use scaffolding that has been installed in the hoistway to position vertical lines that are used to precisely locate elevator components, then to attach mounting brackets that are used to attach the rails along which the elevator car and counterweight run. After completing those steps, Schindler employees will then proceed with the installation of the elevator including standing on the temporary work platform while they install the top-most set of brackets and rails.

28. The NEBA Agreement does not require that erecting the temporary work platform is exclusively the work of IUEC-represented employees. There is nothing in the Agreement that prohibits Schindler from having employees work on platforms or surfaces erected by others. Rather, Article IV, Par. 9 of the NEBA Agreement states "[n]o restrictions shall be imposed as to methods, tools or equipment used." The use of a temporary work platform is a method commonly employed in construction work.

29. On most if not all new construction sites, at least during the early phases of construction before any elevators are operational, Schindler employees use various forms of temporary work surfaces, stairs and scaffolding constructed by the General Contractor. In fact, Schindler recently completed an elevator construction project in Batavia, New York, which is within Local 14's jurisdiction, where the General Contractor had furnished and installed the temporary work platforms.

30. On or about February 1, 2012, Schindler District Manager Peter Hall and New Equipment Field Superintendent Joe Reitano telephoned Local 14 Business Representative Donald M. Winkle, Jr. to inform him about the installation process at the 134 High Street job. Local 14 Business Representative Winkle replied, "our members don't work off scaffolding they

DOWNS
RACHLIN
MARTIN PLLC

7

don't erect." District Manager Hall then contacted the Project Manager at L.P. Ciminelli, who had a certified scaffolding inspector inspect the scaffolding and certify that it is safe and compliant with Occupational Safety and Health Administration ("OSHA") Standards for Scaffolding.

31.     During another conversation between District Manager Hall and Local 14 Business Representative Winkle on or about February 10, 2012, Local 14 Business Representative Winkle claimed that the temporary work platforms built at the top floor of the hoistway by L.P. Ciminelli for use by Schindler employees while installing the elevator motor equipment used to propel the elevator, violates the NEBA Agreement because the platform was not built by IUEC-represented employees. There is nothing in the NEBA Agreement that supports Local 14 Business Representative Winkle's position. To the contrary, as mentioned above, Article IV, Par. 9 provides that "[n]o restrictions shall be imposed as to methods, tools, or equipment used."

32.     It is standard procedure on Schindler's 400A Model elevator, which is a "machine room less" elevator, for the General Contractor to provide a temporary work platform for use by Schindler employees during the installation. In fact, Schindler has installed several machine room less traction elevators within Local 14's jurisdiction using a General Contractor-constructed temporary work platform without incident or objection from the IUEC.

33.     Schindler was scheduled to take delivery of elevator components on Monday, February 20, 2012. Schindler employees were expected to begin the work in dispute on Tuesday, February 21, 2012. District Manager Hall was informed that Local 14 Business Representative Winkle has told Schindler employees who are to be assigned to work at the 134

DOWNS
RACHLIN
MARTIN PLLC

8

123494.1

High Street project that he will be at the jobsite the week of February 20, 2012 and plans to instruct employees that if the scaffolding and the temporary work platform are present on the jobsite, they are to refuse to perform work and walk off the job.

34.    On February 15, 2012, District Manager Hall telephoned Local 14 Business Representative Winkle and asked whether it was true that Local 14 Business Representative Winkle planned to order Schindler employees to refuse to install elevators at the 134 High Street job. He replied that he would not tell Schindler employees to refuse to work because that would violate the no-strike provision in the NEBA Agreement and would be illegal.

35.    On February 16, 2012, Superintendent Reitano discussed the scaffolding and temporary work platform with the Schindler Mechanics assigned to the 134 High Street job, Tom Keating and Pat Kondrick. Superintendent Reitano advised them of the certified inspection and approval, and both Mechanics said they would work off the scaffolding based on the certification and "the word" from Local 14 Business Representative Winkle, and that they had no problem working from the top floor temporary platform once they inspect it to ensure it is safe.

36.    Later in the morning on February 16, 2012, District Manager Hall visited the 134 High Street jobsite. When he arrived, Local 14 Business Representative Winkle was there. Local 14 Business Representative Winkle looked at the temporary work platform and said "that's our work" and added that Local 14 has "several guys on the bench." Local 14 Business Representative Winkle claimed that IUEC members build the platforms in Boston. He did not express any concern about safety and did not comment about the safety of the platform in any way. District Manager Hall asked Local 14 Business Representative Winkle whether he planned on instructing Schindler employees to refuse to work, and again he said he would not because

that would violate the no-strike provision of the NEBA Agreement and be illegal. Local 14 Business Representative Winkle asked District Manager Hall whether he would accept their several discussions about the scaffolding and the temporary work platform as the first step of the grievance process. During these discussions, Local 14 Business Representative Winkle claimed a grievance remedy of payment equal to twelve team (one Mechanic and one Apprentice) hours' wages. District Manager Hall agreed to accept the discussions as the first step and confirmed his agreement by e-mail later in the day.

37. On Friday, February 17, 2012, Jason O'Neil and John Walker of L.P. Ciminelli reported to District Manager Hall that Local 14 Business Representative Winkle had called an employee in a different division of L.P. Ciminelli and said that "our guys will not work off the scaffolding on Monday." Mr. Walker, Vice President of L.P. Ciminelli, was angry and told District Manager Hall that if Schindler does not commence work as scheduled on Monday, February 20, 2012, things will get "ugly."

38. At approximately 10:45 a.m. on Friday, February 17, 2012, District Manager Hall called Local 14 Business Representative Winkle and told him that he had heard from a third party that Local 14 Business Representative Winkle was directing Schindler employees to refuse to work at the 134 High Street job on Monday despite the fact that he had previously said he would not direct employees to refuse to work because such a directive would violate the no-strike provision in the NEBA Agreement. Local 14 Business Representative Winkle said yet again that he would not direct Schindler employees to refuse to work, because such a directive would violate the no-strike provision in the NEBA Agreement and be illegal. He did say, however, that "it's not a breach if it's a safety issue." District Manager Hall reminded Local 14

Business Representative Winkle of the certification that the scaffolding met OSHA safety specifications and of his own personal inspection of the scaffolding and temporary work platform during which he expressed no concern about safety. Local 14 Business Representative Winkle replied that an OSHA certification is "just a piece of paper, and unless we erect it, we can't guarantee safety."

39. Within minutes after the telephone conversation between District Manager Hall and Local 14 Business Representative Winkle, Local 14 Business Representative Winkle sent District Manager Hall a text message that reads "Let me correct myself. Schindler employees can deem a situation or area unsafe to work in."

40. Following receipt of the text message, District Manager Hall spoke with Local 14 Business Representative Winkle again. District Manager Hall asked Local 14 Business Representative Winkle what's really going on here, and whether Local 14 Business Representative Winkle's conflicting statements regarding the scaffolding and temporary work platform were at someone else's direction. Local 14 Business Representative Winkle replied that he was taking direction from someone else and that he expected District Manager Hall took direction from others as well. District Manager Hall understood this to mean that IUEC Regional Director Michael Langer was directing Local 14 Business Representative Winkle to force the work stoppage at the 134 High Street jobsite. During this conversation, Local 14 Business Representative Winkle said that if Schindler continues to "give away our work, there won't be anything for our guys to do." Local 14 Business Representative Winkle also asked whether Schindler contracted with L.P. Ciminelli to build the temporary work platforms, and District Manager Hall said "that's what the General Contractor provides, just like the hoist

beams." A hoist beam is a beam installed at the very top of the hoistway, above where all machinery is installed, and which is used as a point from which to hoist elevator equipment up the hoistway. The General Contractor installs the hoist beam before the elevator company begins work at the site.

41.     On Friday, February 17, 2012 at approximately 4:30 p.m., District Manager Hall sent a cease and desist letter to Local 14 Business Representative Winkle by facsimile and U.S. Mail, with a copy to IUEC Regional Director Langer. A copy of the letter is attached hereto as Exhibit G.)

42.     On Friday, February 17, 2012 at approximately 4:45 p.m., Schindler Area Operations Manager Joseph M. Sena spoke to IUEC Regional Director Michael Langer about Local 14's unlawful directive to Schindler employees to refuse to work at the 134 High Street job. Area Operations Manager Sena asked IUEC Regional Director Langer "what's going on with the scaffolding in Buffalo," and Regional Director Langer replied "it's IUEC work." Area Operations Manager Sena reminded Regional Director Langer that the proper way to resolve such disputes is through the grievance process in Article XV of the NEBA Agreement. Regional Director Langer said that the IUEC and Local 14 are claiming payment equal to twelve team (one Mechanic and one Apprentice) hours' wages for the work performed by non-IUEC members. Area Operations Manager Sena explained that Schindler did not request the scaffolding, but since the General Contractor had already erected it, it is beneficial for safety and productivity to use the scaffolding rather than any alternative methods. Regional Director Langer ended the conversation by saying that he would follow up with Local 14 Business

Representative Winkle and get back to Area Operations Manager Sena. At no point did Regional Director Langer claim that using the scaffolding created any issue of safety.

43.     On the morning of February 20, 2012, District Manager Hall and Superintendent Reitano proceeded to the 134 High Street jobsite and inspected the conditions. They concluded that it was not feasible to use the scaffolding as earlier planned. They spoke to Schindler Mechanics Tom Keating and Pat Kondrick and discussed the installation method for the project including the use of the temporary work platform. Mechanic-in-Charge Keating, who is the Mechanic-in-Charge at the jobsite, confirmed that he understood District Manager Hall's and Superintendent Reitano's directions and how to carry them out. However, Mechanic-in-Charge Keating said that neither he nor Mechanic Kondrick could work using the temporary work platform. Mechanic-in-Charge Keating said that he had received an instruction not to work using the platform that "came down from Dana Brigham [the IUEC's General President]." Mechanic-in-Charge Keating said that installing a temporary work platform is the IUEC's work, and he said that he wanted to remove the temporary work platform and install a new work surface at the top floor made of aluminum decking. District Manager Hall told Mechanic-in-Charge Keating that employees were not permitted to remove the temporary work platform. District Manager Hall asked Mechanic-in-Charge Keating if he received the instruction to refuse to work using the temporary work platform from Local 14 Business Representative Winkle. Mechanic-in-Charge Keating said "I am told that we will not work off the platform." At no point in this conversation did either of the Schindler employees express any safety concern with working using the temporary work platform.

44.    Later in the day on February 20, 2012, Superintendent Reitano returned to the 134 High Street jobsite and instructed Mechanic-in-Charge Keating that in order to proceed with the installation, Schindler employees will work on the temporary platforms. Mechanic-in-Charge Keating replied "we better tell L.P. Ciminelli to install the third temporary platform."

45.    On February 21, 2012, District Manager Hall went to the 134 High Street jobsite and at approximately 7:30 a.m. asked Mechanic-in-Charge Keating and Mechanic Kondrick "when it comes time, are you going to work using the platform as we have directed, or will you refuse?" Mechanic-in-Charge Keating said "no," they will not work as directed. District Manager Hall asked why, and Mechanic-in-Charge Keating said "it's our work." District Manager Hall asked whether they had any safety concerns, and Mechanic-in-Charge Keating said "no." Mechanic-in-Charge Keating said he knows the tradespeople who constructed the platforms for L.P. Ciminelli and admitted it would be an insult to suggest the platforms were unsafe. Mechanic-in-Charge Keatring told District Manager Hall that the Schindler employees hope that Schindler files papers seeking injunctive relief immediately, so that this strike threat can be promptly resolved before they miss work time.

46.    When District Manager Hall returned to his office, he spoke with Local 14 Business Representative Winkle. District Manager Hall told Local 14 Business Representative Winkle that Mechanic-in-Charge Keating and Mechanic Kondrick said they will not work as directed using the temporary platforms and asked whether Local 14 Business Representative Winkle had directed them to refuse. Local 14 Business Representative Winkle said yet again that he cannot tell Schindler employees to refuse to work because that would violate the no-strike provision of the NEBA Agreement and be illegal. District Manager Hall reminded Local 14

DOWNS
RACHLIN
MARTIN PLLC

14

123494.1

Business Representative Winkle of the recent installation in Batavia, New York using temporary platforms furnished and installed by the General Contractor. Local 14 Business Representative Winkle claimed ignorance of that project and further claimed that "in Boson and Hartford, the temporary platforms are installed by IUEC members."

47.     Also on February 21, 2012, District Manager Hall received Local 14 Business Representative Winkle's response to the cease and desist letter. Local 14 Business Representative Winkle again claimed that installation of the temporary work platforms is to be performed exclusively by IUEC members and falsely claimed that "the overhead platforms of Schindler . . . have been done by us." A copy of Local 14 Business Representative Winkle's response is attached as Exhibit H.

48.     On February 21, 2012 at approximately 10:55 a.m., District Manager Hall replied to Local 14 Business Representative Winkle's letter reminding him yet again that by directing Schindler employees to refuse to work as directed, the Unions are violating the no-strike provision of the NEBA Agreement and of the fact that Local 14 already initiated the grievance process over this dispute. District Manager Hall further reminded him that Schindler stands ready to comply with all further steps in the grievance and arbitration procedure. A copy of District Manager Hall's letter is attached hereto as Exhibit I.

49.     As a result of Local 14's and the IUEC's directive, elevator construction work at the 134 High Street project has come to a complete standstill. Schindler is unable to proceed with construction at the jobsite in a timely manner. Schindler has completed all other work pursuant to its contract with L.P. Ciminelli that can be performed prior to proceeding with the work that Local 14 and the IEUC are directing employees to refuse to perform.

## THE IRREPARABLE HARM RESULTING FROM
## THE UNLAWFUL WORK STOPPAGE

50.     The Unions' refusal to work is jeopardizing Schindler's ability to complete construction at the 134 High Street job on time. As discussed above, Schindler's customer has imposed a March 23, 2012 deadline to complete one elevator at the jobsite. The Unions' work stoppage exposes Schindler to a risk that it will not complete construction of the one elevator by the deadline. If Schindler employees do not resume work immediately, Schindler will not be able to complete one elevator by the March 23, 2012 deadline.

51.     The Unions' work stoppage also has and will continue to delay completion of the other elevators at the 134 High Street jobsite. Other aspects of construction at the site, including drywall and detail work around the entrances to the completed elevators cannot even begin until after the elevators are installed. Thus, the work stoppage will adversely impact other trades people at the site, and threatens to delay the completion of other work.

52.     Local 14's refusal to work is preventing Schindler from fulfilling its contractual obligations and jeopardizing Schindler's relationship with L.P. Ciminelli, a valued long-time Schindler customer. Schindler competes with several other elevator and escalator manufacturers in an extremely competitive market for construction contracts awarded by L.P. Ciminelli, which is a significant contractor in the Buffalo and Rochester areas. If Schindler cannot complete the 134 High Street project, its relationship with L.P. Ciminelli will be harmed, and Schindler's prospects of being engaged by L.P. Ciminelli on future projects will be in jeopardy. Moreover, because large General Contractors often communicate with each other, any problems with L.P. Ciminelli's job will likely diminish Schindler's prospects of getting jobs from other contractors.

DOWNS
RACHLIN
MARTIN PLLC

16

123494.1

53.     Local 14's refusal to work is also jeopardizing Schindler's relationship with the owner of the 134 High Street project, Kaleida Health. Schindler is in position to be awarded a contract to maintain the elevators at the 134 High Street project after their warranty expires. Like the market for elevator construction, the market for elevator maintenance is extremely competitive. Timely completion of a construction contract is often one of the most important factors in determining whether the Company is successful in being hired to service elevators and escalators. If Schindler is unable to complete construction of elevators at the 134 High Street job in a timely manner, its prospects of being awarded the maintenance contract, potentially worth more than $1,000.00 per month will be severely jeopardized.

54.     The work stoppage has already harmed Schindler's reputation and good will with L.P. Ciminelli and with Kaleida Health, and the harm will increase the longer the work stoppage continues.

55.     Schindler demanded that the IUEC and Local 14 cease their illegal work stoppage. The Unions have refused.

56.     The Unions' refusal to work as directed at the 134 High Street job is an illegal work stoppage over a dispute that the Unions themselves claim is subject to the NEBA Agreement's grievance and arbitration provisions, in violation of Articles IV, XIV and XV of the NEBA Agreement.

57.     The unlawful acts specified herein were committed by Local 14 acting through their agents and members in concert with and/or at the direction of the IUEC.

58.     Despite Schindler's demands that the IUEC and Local 14 cease their illegal work stoppages and comply with the NEBA Agreement, the Unions have refused.

DOWNS
RACHLIN
MARTIN PLLC

17

59.    By Defendants' own admission, their course of action is in deliberate, willful and calculated violation of the NEBA Agreement and in disregard of the arbitration process.

60.    Upon information and belief, unless restrained by order of this Court, the concerted refusal to work by the employees represented by Defendants will continue.

61.    Unless Defendants are enjoined from their illegal and unlawful acts, and are ordered to resume performance of work, such actions will continue to cause immediate, substantial and irreparable harm to Schindler, the amount of which cannot be definitely ascertained, in that:

a.    Schindler has been and will be unable to render adequate performance of its contractual obligations to install the elevators at the 134 High Street job; and

b.    Schindler will suffer temporary and permanent loss of business as a result of damage to its goodwill and reputation in the industry and its commercial relationships as a result of which its ability to bid on future contracts will be impaired.

62.    The effect on the Defendants, if injunctive relief is granted, is less onerous than the harm that will be suffered by Schindler, its customer, and visitors to the parking garage at 134 High Street, if the injunction is not granted.

63.    Schindler has complied with all obligations imposed by law that are involved in this labor dispute.

64.    Schindler has made every reasonable effort to settle this labor dispute.

65.    No prior application for the relief herein sought by Schindler or for similar relief has been made to any court or judge of the United States or of any state.

WHEREFORE, Plaintiff demands judgment:

(I)      Granting Plaintiff a temporary restraining order, and a preliminary and permanent injunction, restraining and enjoining Defendants, their officers, agents, representatives, members, employees and attorneys and all persons acting in concert or participation with them, including but not limited to the individuals named as Defendants in this Verified Complaint, from in any manner or by any means:

(A)      calling, causing, inducing, encouraging, authorizing, conducting, continuing in or engaging in any strike, work stoppage, work slowdown, sit-down or any other refusal to work or act of coercion or interference with Plaintiff's normal operations;

(B)      by Union discipline, penalty or otherwise, interfering with, or inducing or attempting to induce any person to interfere with any employee or agent of Plaintiff in the course of any such employee's or agent's work for Plaintiff;

(C)      by threats or otherwise, interfering with or attempting to induce any person to interfere with or otherwise affect the ordinary continuation of Plaintiff's operation, and from taking any action which would interfere with this Court's jurisdiction in the premises;

(D)      causing, inducing, conducting or carrying out any concerted activity of any kind having the effect of interfering with the Plaintiff's normal operations prior to the hearing on Plaintiff's application for a preliminary injunction;

(II)      Directing Defendants to take all reasonable means to communicate and effectuate the provisions of the orders issued by the Court, including but not limited to the holding of meetings with employees represented by Defendant IUEC and Defendant Local 14, and the issuance forthwith of appropriate notices or other communications to the members, officers, and

agents of Defendants, and all those in active concert with them; requiring the immediate return to work of all employees of Plaintiff represented for collective-bargaining purposes by Defendants; and rescinding any oral or written notices, orders, directions, or requests to employees of Plaintiff authorizing, directing, inducing or encouraging any strike, slow-down, work stoppage refusal to work or other limitation upon production;

(III)    Directing Defendants together with Plaintiff forthwith to arbitrate, pursuant to the collective-bargaining agreement between Plaintiff and Defendants, the present dispute; and

(IV)    Granting such other and further relief to which Plaintiff may be entitled, including damages, costs and disbursements of the action.

February 21, 2012

ATTORNEYS FOR PLAINTIFFS
NATIONAL ELEVATOR BARGAINING
ASSOCIATION and SCHINDLER
ELEVATOR CORP.

BOND, SCHOENECK & KING, PLLC

By_____
Robert A. Doren Esq.
Key Center
40 Fountain Plaza,, Suite 600
Buffalo, NY 14202-2200
Telephone: (716) 566-2800
Fax: (716) 566-2808
E-mail: rdoren@bsk.com

DOWNS RACHLIN MARTIN PLLC

By   /s/ Timothy E. Copeland, Jr.
Timothy E. Copeland, Jr.
28 Vernon Street, Suite 501
Brattleboro, VT  05302-00009
Telephone: 802-258-3070
Fax:  802-258-2286
E-mail:  tcopeland@drm.com

DOWNS
RACHLIN
MARTIN PLLC

123494.1

## VERIFICATION

STATE OF NEW YORK
_____ COUNTY, SS.

Peter Hall hereby certifies as follows:

I am the District Manager for Schindler Elevator Corp.'s Western New York District. I have read the foregoing Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

| 2/21/2012 | Peter Hall |
| Date | Peter Hall |

STATE OF NEW YORK
Erie_____ COUNTY, SS.

At Williamsville, New York, this 21st day of February 2012, Peter Hall, personally appeared, gave oath to the truth of the foregoing, and he/she acknowledged this instrument, by him/her sealed and subscribed, to be his/her free act and deed.

Before me _____
Notary Public
Commission Expires:

MICHELLE M. POLONSKI
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01PO4845764
QUALIFIED IN ERIE COUNTY
MY COMMISSION EXPIRES JAN. 31, 2014

21

DOWNS
RACHLIN
MARTIN PLLC

# Exhibit A

Case 1:12-cv-00159-RJA   Document 1   Filed 02/21/12   Page 23 of 125

# NEBA AGREEMENT

## WITH
## INTERNATIONAL UNION
### —of—
## ELEVATOR CONSTRUCTORS

*July 9, 2007 to*
*July 8, 2012*





## INDEX

Whenever any words are used in this Agreement in the masculine gender they shall be construed as though they are also used in the feminine gender or neuter gender in all situations where they would so apply.

| ARTICLE | | Page |
|---|---|---|
| I | Parties to the Agreement | 1 |
| II | Recognition Clause | 1 |
| III | Membership Requirements | 2 |
| IV | Work Jurisdiction | 5 |
| IV (A) | Systems, Modular and Industrial Structure | 17 |
| V | Wages | 20 |
| VI | Holidays | 24 |
| VII | Construction Work | 26 |
| VIII | Repair Work | 31 |
| VIII (A) | Modernization Work | 35 |
| IX | Contract Service | 39 |
| X | Designation of Apprentices/ Helpers Work and Qualifications | 47 |
| XI | System of Payment | 52 |
| XII | Vacations | 55 |
| XIII | Traveling Time and Expenses | 58 |
| XIV | Strikes and Lockouts | 60 |
| XV | Arbitration | 62 |
| XVI | Jurisdictional Territory | 70 |
| XVII | Health Benefit Plan | 72 |
| XVIII | Pension Plan | 75 |

| ARTICLE | | Page |
| --- | --- | --- |
| XVIII (A) | 401(k) Annuity | 78 |
| XIX | Educational Fund | 79 |
| XX | Elevator Industry Work Preservation Fund | 82 |
| XXI | Payment for Lost or Stolen Tools | 84 |
| XXI (A) | Metric Tools | 85 |
| XXII | Hiring, Layoffs and Transfers | 86 |
| XXIII | Scope and Terms of Agreement | 94 |
| XXIV | Re-Opening Clause | 95 |
| XXV | Termination of Agreement | 96 |
| XXVI | Local Option | 96 |
| XXVII | Reporting Time, Subpoenaed Witnesses, Uniforms | 98 |

Appendix "A" Decisions of the Joint Industry Committee .............. 105

Letters of Agreement ................ 115

Substance Abuse .................... 130

# ARTICLE I

## Parties to the Agreement

This Agreement, made by and between the National Elevator Bargaining Association (hereinafter referred to as "NEBA") and the INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS (hereinafter referred to as "IUEC" or the "Union"), for the purpose of establishing harmonious relations and facilitating peaceful adjustment of wage schedules and working conditions. The INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS makes this Agreement for and on behalf of its affiliated local unions and a list of the local unions for which the International negotiates and executes this Agreement is attached hereto and made a part hereof. NEBA makes this Agreement for and on behalf of its employer members (hereinafter referred to individually as the "Company" or the "Employer"), and a list of the Employers for which NEBA negotiates and executes this Agreement is attached hereto and made a part hereof.

# ARTICLE II

## Recognition Clause

**Par. 1.** The Union claims and the Employer acknowledges and agrees that the Union has supplied proof that a majority of its Elevator

1

Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices have authorized the Union to represent them in collective bargaining with the Employer.

The Employer recognizes the Union as the exclusive Section 9(a) bargaining representative for all Elevator Constructor Mechanics and Elevator Constructor Helpers and Elevator Constructor Apprentices (hereinafter referred to sometimes as "Mechanics, Helpers and Apprentices") in the employ of the Employers engaged in the installation, repair, modernization, maintenance and servicing of all equipment referred to in Article IV, Par. 2 and Article IV (A).

**Par. 2.** The Union recognizes that it is the responsibility of the Company in the interest of the purchaser, the Company and its employees to maintain the highest degree of operating efficiency and to continue technical development to obtain better quality, reliability, and cost of its product provided, however, that this provision is not intended to affect the work jurisdiction specified in Article IV and other Articles of the Agreement.

## ARTICLE III

### Membership Requirements

**Par. 1.** All Mechanics, Helpers and Apprentices

2

covered by this Agreement shall, as a condition of employment obtain and maintain membership in a local union of the International Union of Elevator Constructors on and after the thirtieth (30th) day following the beginning of their employment or the date this Article becomes effective, whichever is later.

**Par. 2.** The Company shall be obligated under this Article, after it becomes effective as above provided, to terminate the employment of any employee who fails to obtain or maintain membership in a local union as required by this Article, upon receipt of a written request for such termination from his local union: except that the Company shall have the right to refuse such request if it has reasonable grounds for believing (1) that such membership is not available to the employee on the same terms and conditions generally applicable to other members, or (2) that membership has been denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

**Par. 3.** Employees working in any state which prohibits the execution or application of Agreements requiring membership in a labor organization as a condition of employment have the right to join or refrain from joining

3

the International Union of Elevator Constructors. Employees who decide not to join the Union, however, and who are covered by this Agreement shall, as a condition of employment, be required to pay a monthly service fee to the Union. The service fee shall be the employees' prorata share of costs of collective bargaining and the handling of grievances and arbitrations. The service fee shall not include any prorata share of costs of items other than collective bargaining and handling of grievances and arbitrations, and under no circumstances will the service fee be used by the Union for any purpose other than to meet the expenses of collective bargaining and handling of grievances and arbitrations.

On and after the thirtieth (30th) day following the date of this Agreement or on and after the thirtieth (30th) day following the date of commencement of employment by an employee, whichever is later, regular tendering of the service fee shall be a condition of employment, subject to the rights of employees and obligations of parties under the law.

Service fees shall be payable on or before the first day of each month.

**Par. 4.** All of the provisions of this Article shall be effective to the extent permitted by applicable law.

4

## ARTICLE IV

### Work Jurisdiction

**Par. 1.** It is agreed by the parties to this Agreement that all work specified in Article IV shall be performed exclusively by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices in the employ of the Company.

**Par. 2.**

(a) The handling and unloading of all equipment coming under the jurisdiction of the Elevator Constructor, from the time such equipment arrives at or near the building site, shall be handled and unloaded by the Elevator Constructors. Mechanical equipment such as a fork lift or truck mounted swing boom may be used by the Elevator Constructors. A derrick, crane or material hoist can be used under the supervision of Elevator Constructors to handle and unload the heavy material described in Paragraph 5(a). Where unusual conditions are expected to exist prior to delivery of equipment at or near the building site in regard to handling and unloading of equipment in the primary or secondary jurisdiction of the local union, the Company shall contact the Local's Business Representative to make appropriate arrangements for the handling and unloading of such equipment. In areas outside the jurisdiction of the local union, the Company shall contact the Regional Director.

5

(b) The erecting and assembling of all elevator equipment to wit: electric, hydraulic, steam, belt, dumbwaiters, residence elevators, parking garage elevators (such as Bowser, Pigeon Hole, or similar types of elevators), shuttles, compressed air and handpower, automatic people movers, monorails, airport shuttles and like-named devices used in the transportation of people for short distances of travel (less than 5 miles), as well as vertical reciprocating conveyor systems.

(c) It is understood and agreed that the pre-assembly of all escalators, moving stairways and link belt carriers that may be done in the factory shall include the following:

1. Truss or truss sections with tracks, drive units, machines, handrail drive sheaves, drive chains, skirts on the incline sections but not curved sections, step chains and steps installed and permanently aligned.

2. Balustrade brackets may be shipped attached but not aligned.

3. Setting of all controllers and all wiring and conduit from the controller.

All other work on escalators, moving stairways and link belt carriers shall be performed in the field by Elevator Constructor Mechanics, Helpers and Apprentices either before or after the truss or truss sections are joined and/or hoisted and placed in permanent position. This includes any and all work not done in the factory.

The erecting and assembly of all theater stage and curtain elevator equipment and guides and rigging thereto, organ consoles and orchestra elevators shall be performed by Elevator Constructor Mechanics, Helpers and Apprentices.

(d) All wiring, conduit, and raceways from main line feeder terminals on the controller to other elevator apparatus and operating circuits. Controllers are not to be shipped from the factory with extended wiring attached thereto.

(e) The erecting of all guide rails.

(f) The installation of all grating under the control of the Company. The installation of all counterweight screens, overhead work, either wood or iron, and all material used for mounting of elevator apparatus in machine room, overhead or below.

(g) The drilling of overhead beams for attaching machines, sheaves, kick angles, and all other elevator equipment.

(h) The setting of all templates.

(i) All foundations, either of wood or metal, that should take the place of masonry.

(j) The assembly of all cabs complete.

(k) The installation of all indicators.

(1) The erecting of all electrical or mechanical automatic or semi-automatic gates complete.

(m) The hanging of all automatic or semi-automatic elevator hoistway doors, together with the installation of hangers and tracks.

6

7

(n) The installation of all devices for opening and closing, and locking of elevator car and hoistway doors and gates.

(o) The drilling of doors for mounting of closing devices.

(p) The drilling of angle supports for mounting of closing devices except one template hole.

(q) The drilling of sills for sill trips.

(r) The operating of temporary cars.

(s) The setting of all elevator pressure open or pit tanks.

(t) The setting of hydraulic power units (power units include: motor, pump, drive valve system, internal piping, muffler, internal wiring, controller and tank). Where power units arrive in parts, they shall be assembled at the job site. The wiring and piping to and between multiple hydraulic power units shall be performed at the job site.

(u) All air cushions with the exception of those built of brick or those put together with hot rivets.

(v) Landing door entrances.

## Par. 3.

(a) Nothing contained in Article IV shall preclude the Company from preassembling and prefabricating the following:

(1) Temporary elevators

A temporary elevator is defined as a nonpermanent elevator installed prior to or during construction work inside or outside buildings. The assembly, disassembly and moving of temporary elevators from job to job or area to area may be accomplished in the most economical fashion provided, however, whatever work is required to be performed at the job site in connection therewith shall be performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices.

(2) Residence elevators

Residence elevators shall mean elevators installed solely for use in a single family residence and not for general public use. Single family residences may be part of a multi-unit structure.

(3) Dumbwaiters

(4) Dock elevators

(5) Parking garage elevators (such as Bowser, Pigeon Hole or similar types of elevators)

(6) Apartment House elevators

Apartment house elevators shall mean an elevator installed in a multi-unit, multifamily structure, (excluding condominiums) but not to exceed three (3) stories in height (i.e. 36 ft.) and the elevator shall not make more than three (3) stops nor exceed a capacity of 2500 lbs.

(7) Preassembled plug connectors may be used to interconnect the solid state components of the elevator systems (solid state to solid state only), and to connect any compo-

8

9

nent in and on the car (excluding traveling cable).

When the use of fiber optics is applied to the elevator system, preassembled plugs/coupling devices may be used to maintain the integrity of the connection(s).

It is understood and agreed that the connecting and/or coupling of devices will be done by the Elevator Constructor whether accomplished by external wiring or preassembled plug connectors as provided in this Paragraph.

(8) Limited Use/Limited Access Elevators which shall mean elevators described under the scope of Limited Use/Limited Access Elevators as defined in A.S.M.E. A17.1.

Incline stairway chair lifts and incline and vertical wheelchair lifts shall mean lifts described under the scope of A.S.M.E. A17.1.

Limited Use/Limited Access Elevators, incline stairway chair lifts, inclined and vertical wheelchair lifts, and residence elevators may be installed in the most economical fashion, provided there is no factor of safety involved. Whatever work is required to be performed at the job site in connection therewith shall be performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices.

(9) Landing door entrance assemblies which will be limited to struts, sills, headers, frames and associated hardware for installation purposes: door header including tracks, hangers,

and all relating devices (adjusting and aligning to be done in the field).

(10) Car-top inspection station which may only include pre-wired service light, gate switch, alarm device and inspection station.

(a) Pre-wired canopies with lights and fans.

**Par. 3.** (b) It is understood and agreed that the preassembly and/or prefabrication of electric walks, Trav-o-lators, speed ramps or similar type of moving walks, (limited to 15° incline per ANSI Code), shall include the following:

(1) Truss sections with drive units, machines, handrail drive sheaves and drive chains installed and aligned.

(2) Truss sections with tracks installed and aligned.

(3) Balustrade brackets may be shipped attached but not aligned.

(4) Setting of all controllers and all wiring and conduit from controllers.

Work to be done in the field shall include setting and aligning of truss sections and supports, installation of pallets (platforms and belting), handrails, handrail idler sheaves, centering guides, combplates, balustrades and trim.

**Par. 4.**

(a) It is agreed that when sinking, drilling, boring or digging cylinder wells for hydraulic lifts, hydraulic elevators or screw lifts, the

10

11

Company shall employ Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

(b) On any job where the Company subcontracts the sinking, drilling, boring or digging of cylinder wells for hydraulic lifts, hydraulic elevators or screw lifts, one Elevator Constructor Mechanic shall be employed by the Company to supervise and assist in any and/or all work related to sinking, drilling, boring or digging of the cylinder well including the installation of the casing whether its sections be welded, screwed or riveted or by any other method joined.

(c) It is agreed that the work performed by the subcontractor shall be strictly limited to work in connection with the digging of the hole and the installation of the casing. It is understood that the Company will have the preceding sentence inserted in his contract with the subcontractor.

(d) The Company shall have the Elevator Constructor Mechanic on the job at the time the subcontractor arrives on the job for the drilling of the hole and during the entire time the subcontractor performs any work in connection with the drilling of the hole including the setting up and/or assembly and disassembly of the rig.

(e) If the Company violates the requirement defined in Par. (d) it shall be assessed and pay as liquidated damages a sum equal to double the total compensation of the Elevator Con-

structor Mechanic in the area for the number of hours an Elevator Constructor Mechanic should have been on the job and was not on the job in the sinking, drilling, boring or digging the cylinder well. This liquidated damage shall be paid by the Company to the said jointly administered trust fund.

In the case of a second offense, the liquidated damages shall be computed on the same basis as the first offense, except that the amount shall be tripled instead of doubled; for the third and subsequent offenses during the term of this Agreement, the liquidated damages shall be $500 more than the second offense.

The Company's Regions shall constitute separate areas for the counting of repeated violations by the Company and only violations in the same district shall be counted for the purpose of imposing graduated penalties.

(f) Should a work stoppage or strike occur because of a dispute over the application or interpretation of this paragraph none of the foregoing penalties will be imposed.

**Par. 5.**

(a) Where heavy material is to be hoisted or lowered outside of the structure, a derrick, crane or material hoist can be used under the supervision of Elevator Constructors in the employ of the Company. Heavy material under subparagraph (a) is confined to machines, controllers, generators, trusses, or sections of

12

13

trusses, plungers and cylinders. (Where multiple sections of cylinders and plungers are used, they shall be connected in the field by Elevator Constructors. Exception: the Company's multiple sections of cylinders may be connected either in the field or factory up to thirty-eight (38) feet in length; where multiple sections of plungers are used, they shall be connected in the field by Elevator Constructors.) In addition to the foregoing, the Company shall have the right to utilize derricks, cranes or a material hoist to hoist or lower tools of the trade, gang boxes, welders, air and gas tanks, cutting torches, material handling equipment and safety equipment.

(b) Where conditions are such that the following heavy material can be hoisted up the hoistway, it shall be hoisted by the Elevator Constructors. Where conditions are such that the following heavy material cannot be hoisted up the hoistway, it can be hoisted with a crane or material hoist under the supervision of Elevator Constructors. Heavy material under subparagraph (b) is confined to beams, sheaves, bundles of rails and preassembled landing door entrances.

(c) The above heavy material in subparagraphs (a) and (b) shall be hoisted separately with the exception of plungers and cylinders, rails, beams, preassembled landing door entrances and where conditions warrant machines with beams, which may be hoisted together.

14

(d) All other material is to be hoisted or lowered by Elevator Constructors without the use of derrick or crane.

**Par. 6.** The wrecking or dismantling of elevator plants shall be performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices. It is understood and agreed that the Union reserves the right to refuse to install any new elevators in any plant where the wrecking or dismantling of the old elevator plant has been done by other than Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices. Before the local union shall refuse to install a new elevator, such action must be first approved by the International. Elevator plants as referred to in this paragraph are understood to include elevators, escalators, moving stairways, dumbwaiters, moving walks and all other equipment coming under the jurisdiction of the Elevator Constructor.

**Par. 7.** Where Elevator Constructor Mechanics are not available to lay car floor covering, it is agreed that the Company may employ others to do this work.

**Par. 8.** Inserts and/or bond blocks are to be set by Elevator Constructor Mechanics in the primary jurisdictions of local unions at the option of the Company. Inserts may be set by

15 .

others outside of the primary jurisdictions of local unions where a full day's work cannot be provided.

**Par. 9.** No restrictions shall be imposed as to methods, tools, or equipment used.

**Par. 10.** It is agreed that the work specified in Article IV has always been performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices in the employ of the Company at the site of the installation. It is agreed that effective July 9, 1977, the work specified in Article IV that is performed exclusively by Elevator Constructor Mechanics, Helpers and Apprentices may be performed at the site of the installation or at another assembly point provided that (1) the assembly point is not in or adjacent to the Company's manufacturing facility, (2) the assembly point is within the primary or secondary jurisdiction of the local union in whose jurisdiction the site of installation is located, and (3) the work is performed by Elevator Constructor Mechanics, Helpers and Apprentices of the local union in whose jurisdiction the site of installation is located. If the site of installation is located outside the jurisdiction of a local union (in open territory), it is agreed that (1) the assembly point must be within twenty-five (25) miles of the site of installation, (2) the assembly point is not in or adjacent to the Company's manufacturing facility, and (3) the work is per-

16

formed by Elevator Constructor Mechanics, Helpers and Apprentices from the local union who ordinarily perform work for the Company in the vicinity of the site of the installation. The unloading and handling of all equipment coming under the jurisdiction of the Elevator Constructor at an assembly point shall be performed in accordance with Par. 2(a) of this Article.

**Par. 11.**

(a) All differences and disputes concerning Article IV or Article IV(A) shall be settled in accordance with the grievance procedures in Article XV.

(b) While any question or dispute pertaining to Article IV or Article IV(A) is being processed, the Company, where possible, shall assign the employees work other than the work in dispute. Where the work has progressed to a point where it is not possible to perform work other than the work in dispute, then the employee shall perform the disputed work pending final resolution as provided herein.

## ARTICLE IV(A)

## Systems, Modular and Industrial Structures

**Par. 1.** Systems Building. Systems, modular, industrialized or similar structures are those whose superstructures and components are

17

pre-assembled in sections, rooms, or floors, in whole or in part, in areas adjacent to or remote from the permanent site of the structure. The erection and assembly of elevator components in building modules is to be done by Elevator Constructor Mechanics, Helpers and Apprentices whether the assembly site is adjacent to the job or remote from the job. Where the Company has a choice or selection of the assembly site, such sites are to be mutually agreed upon by the General President of the International Union of Elevator Constructors and the Company. It is understood that if members of one local perform part of such work at an assembly site remote from the permanent job site, members of the local covering the permanent job site will perform the remainder of the work. The elevator work remaining to be done after modules have been put into permanent place, shall be performed by Elevator Constructor Mechanics, Helpers and Apprentices so that the jurisdiction of the Elevator Constructor as related to any other Building Trade, shall remain intact as outlined in the latest "Green Book" or "Plan for Settling Jurisdictional Disputes, Nationally & Locally" or its successor as approved by the Building & Construction Trades Dept., AFL-CIO.

**Par. 2.** The work to be done by Elevator Constructors is as follows:

(a) The installation and assembly of all machine room equipment whether overhead or below on prefabricated machine room floors.

(b) Assemble car frames and cabs complete with door operating equipment, control, signal and operating devices.

(c) Connect electric traveling cables to either car, controller or half-way junction box. The connections to be prepared and/or made at both ends of assembly site.

(d) Shackle hoist, compensating and governor cables and pre-connect to car or counterweight hitches.

(e) The setting of templates.

(f) The installation of all grating and counterweight screens, overhead work, either wood or iron, and all material used for mounting of elevator apparatus in machine rooms, overhead or below.

(g) All foundations, either of wood or metal, that should take the place of masonry.

(h) The installation and aligning of guide rails in hoistway modules.

(i) Erect and assemble doors, hangers, tracks, door locks or locking devices for opening or closing and all related equipment.

(j) Install corridor side operating and signal devices.

(k) Install hoistway wiring.

(l) Install all elevator equipment and devices in hoistway and hoistway modules including governor rope tension sheaves, control equipment, buffers and supports.

18

19

(m) The operating of temporary elevators.

(n) The installation and aligning of all pistons and cylinders on hydraulic elevators.

(o) Landing door entrances.

Unloading, handling, hoisting and lowering of material covered in (a) through (o) will be performed under the supervision of Elevator Constructors.

**Par. 3.** Nothing in this Article is intended to change the practices either party has previously enjoyed in erection of elevators in conventional type buildings as related to Article IV.

## ARTICLE V

### Wages

**Par. 1.** The rate of wages to be paid to Elevator Constructor Mechanics, Helpers and Apprentices shall be determined in accordance with the following schedule. Effective January 1, 2008 and every twelve (12) months thereafter, during the term of this Agreement, each local's existing total package shall be increased according to the following schedule:

1st Year Gross Increase . . . . . . . . . . . . . 5.75%

2nd Year Gross Increase . . . . . . . . . . . . . $3.00

3rd Year Gross Increase . . . . . . . . . . . . . $3.00

4th Year Gross Increase . . . . . . . . . . . . . $3.00

5th Year Gross Increase . . . . . . . . . . . . . $3.00

**Par. 2.** Subtracted from the gross increase shall be the credits agreed upon in Paragraph 3 below. The remainder shall be the wage rate increase for the Elevator Constructor Mechanics in that Local.

**Par. 3.** The amounts of credits for wage rate increases effective January 1, 2008 and every twelve (12) months thereafter shall be as follows:

**Current Wage Rate Amount**

| Contribution Level $15.065 | Fringe | Total |
|---|---|---|
| January 1, 2008 . . . . . . . . . . | $1.25 | $16.315 |
| January 1, 2009 . . . . . . . . . . | $1.75 | $18.065 |
| January 1, 2010 . . . . . . . . . . | $1.50 | $19.565 |
| January 1, 2011 . . . . . . . . . . | $1.50 | $21.065 |
| January 1, 2012 . . . . . . . . . . | $1.50 | $22.565 |

The above gross increases will be reallocated and the above credit amounts increased or decreased accordingly after the effective date of this Agreement by whatever different amounts, if any, the Union determines are necessary to fund the Health Plan, the Pension Plan, Education Fund and Elevator Industry Work Preservation Fund by modifying the hourly contribution rate up to twenty five

20

21

($.25) cents per fund per year at the recommendation of the joint trustees.

The above gross increase will be reallocated and the above credit amounts increased or decreased accordingly after the effective date of this Agreement by whatever different amounts, if any, the Union determines is necessary to fund the Annuity Fund by modifying the hourly contribution rate up to twenty five ($.25) cents to the Annuity Fund per year at the discretion of the Union.

Par. 4. Subtracting the credits from the gross increases yields the following wage rate increases for the Elevator Constructor Mechanic:

1st Year Wage Rate Increase...... Subtract the $1.25 per hour fringe contribution increase from the computed total package percentage, and the result will be the wage rate increase for the Elevator Constructor Mechanic.

2nd Year Wage Rate Increase ........ $1.25

3rd Year Wage Rate Increase......... $1.50

4th Year Wage Rate Increase......... $1.50

5th Year Wage Rate Increase......... $1.50

22

Par. 5. The wage rate for the Elevator Constructor Helpers shall be seventy (70) percent of the Elevator Constructor Mechanic's rate.

Par. 6. The wage rate for Elevator Constructor Apprentices shall be the progressive scale of wages set forth below, and those progressive elevations shall become effective the next full pay cycle following September 1st, commencing September 1, 2003 and each year thereafter.

Probationary Apprentice, (0-6 months): 50% of Mechanic's Rate.

First Year Apprentice, 55% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement.

Second Year Apprentice, 65% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement.

Third Year Apprentice, 70% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement.

Fourth Year Apprentice, 80% of Mechanic's Rate, plus fringe benefits as provided by the collective bargaining agreement.

Par. 7. When four (4) or more men, including the Elevator Constructor Mechanic-In-Charge, are employed on new construction or modernization jobs, the Elevator Constructor Mechanic-In-Charge of the job shall have his hourly rate increased 12-1/2% for all hours worked.

23

**Par. 8.** The wage rate of a given Local shall continue as long as satisfactory to both parties, but no change be made more often than twelve (12) months.

**Par. 9.** The gross increases set out in this Article shall apply to all Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices engaged in construction, repair, modernization and contract service work, as defined and covered in this Agreement.

## ARTICLE VI

### Holidays

**Par. 1.** The following shall be designated as paid holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day, the Friday after Thanksgiving Day and Christmas Day.

**Par. 2.** In addition, each local may retain established unpaid holidays already agreed upon by past procedure or observed by local building trades councils or declared by State or National Governments. Any new Federal holidays such as Presidents' Day and Columbus Day are not to be considered as paid or unpaid holidays unless previously celebrated by the parties to this Agreement.

24

**Par. 3.** To be eligible for a paid holiday, an employee must have been on the Company's payroll within the calendar week, Sunday to Saturday inclusive, previous to the week in which the holiday occurs. "On the payroll" means that an employee must have performed actual work or have been on an authorized paid vacation. If an employee desires to extend his vacation beyond the earned paid vacation period, such extension of that time shall not be considered as "on the payroll".

**Par. 4.** The holiday provisions of this Article shall apply to all Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices engaged in construction, repair, modernization and contract service work as defined and covered in this Agreement.

**Par. 5.** Eligible employees shall be paid for the regular workday and the paid holidays enumerated in Par. 1 at the regular straight time rate of the classification worked prior to the observance of the holiday. The rate of pay for all work performed on paid holidays shall be at the double time rate in addition to the holiday pay. Any unpaid holidays observed as provided in Par. 2 shall be without pay, but if worked shall be double time rate.

**Par. 6.** When a paid holiday falls on Saturday, it shall be observed on Friday. When a paid holi-

25

day falls on Sunday, it shall be observed on Monday.

**Par. 7.** The Company shall not lay off or terminate an employee to circumvent holiday pay as provided herein.

**Par. 8.** Employees who work on a holiday that falls on a Saturday or Sunday and that holiday is observed on a Friday or Monday, respectively, shall be paid at the specified overtime rates for work performed on Saturdays or Sundays. (i.e., if July 4th falls on Saturday it will be celebrated on Friday, July 3rd. Work performed on July 3rd will be double time (2X) and work performed on July 4th will be paid at the specified overtime rate).

## ARTICLE VII

### Construction Work

**Par. 1.** Construction work is hereby defined as erecting and assembling of apparatus as enumerated in Article IV and Article IV (A) of this Agreement, except general repairs and modernization as defined in Article VIII and VIII (A). It is hereby agreed that all Construction Work as above defined shall be performed exclusively by Mechanics, Helpers and Apprentices.

26

**Par. 2.** It is agreed that the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M., and 5 P.M., five (5) days per week, Monday to Friday, inclusive. Hours of work at each job site shall be those established by the general contractor and worked by the majority of trades. (The above working hours may be changed by mutual agreement as provided in Article XXVI). If the general contractor shuts down operations on a day not recognized as a holiday under this Agreement, the Company shall make every effort to place the affected employees on other work for that day.

**Par. 2A.** Upon written notification to the Local Business Representative, the Company may establish hours worked on a job site for a four (4) ten (10) hour day workweek at straight time pay for construction work. It is agreed that the regular working day shall consist of ten (10) hours worked consecutively with an unpaid lunch period, between 6 A.M. and 6 P.M., four (4) days per week, Monday to Thursday, inclusive. Any work performed on Friday, Saturday and Sunday and before and after the regular working day on Monday to Thursday where a four (4) ten (10) hour day workweek has been established, will be paid double the rate of single time.

When working in a per diem area and work continues on the same job site the following

27

week, the employee shall receive per diem for Friday, Saturday and Sunday.

It is agreed that when a Holiday falls on Sunday to Thursday, it shall be observed on the day of the Holiday or per Article VI, Par. 6 and, providing the employee complies with Article VI, Par. 3, he/she will be paid ten (10) hours for that Holiday. If the Holiday falls on Friday or Saturday, the employee will be paid eight (8) hours for that Holiday.

**Par. 3.** Work performed on Construction Work on Saturdays, Sundays and before and after the regular working day on Monday to Friday, inclusive, shall be classed as overtime, and paid for at double the rate of single time.

**Par. 4.** When any four (4) of the seven (7) Atlantic City Formula Trades obtain a six (6) hour day, the Union shall work a six (6) hour day, the working day to be between the hours of 6 A.M. and 5 P.M. When sufficient Mechanics, Helpers and Apprentices are not available, an eight (8) hour day shall be worked. Whenever a local union obtains a six (6) hour day under this paragraph, the local union and the Company shall bargain as to the hours and overtime rates to be applied on the six (6) hour day.

**Par. 5.**

(a) When a majority of the Atlantic City Formula Trades (this means there must be four

(4) of the seven (7) union Atlantic City trades), on a job work a shift or shifts following the day shift, the Company may work the following shifts. However, trades who perform the work as per their regular overtime rates shall not be considered as shift work.

(b) It is agreed that the "Day Shift" shall consist of eight (8) hours between 8 A.M. and 4:30 P.M., five (5) days per week, Monday through Friday, inclusive.

(c) The shift following the "Day Shift" shall work 7 1/2 hours between the hours of 4:30 P.M. and 12:30 A.M. and shall receive eight (8) hours pay plus an additional 10% per hour. The shift preceding the "Day Shift" shall work seven (7) hours between the hours of 12:30 A.M. and 8 A.M. and receive eight (8) hours pay plus an additional 15% per hour.

Any and all work during hours other than the established hours for any one of the three shifts shall be paid at double the hourly wage rate including any premium rate of the assigned shift.

(1) When an employee is called in prior to the regular starting time for his shift or he works beyond the regular quitting time of his shift, he shall receive double the hourly wage rate of his assigned shift for all hours in excess of the established hours for his shift.

(2) When an employee is required to work hours that are not continuous with the established hours for his assigned shift he shall be

28

29

paid for such hours at double the hourly wage rate of his assigned shift or double the hourly wage rate of the shift on which such excess hours are performed whichever rate is higher.

(3) When the Company assigns an employee to a shift the employee shall work that shift a minimum of five (5) consecutive days. However, should the Company reassign an employee to another shift prior to working five (5) consecutive days, or within twenty-four (24) hours of completing a shift, the employee shall receive the applicable overtime rate of the new shift he is assigned to for the first day only or the applicable overtime rate of the shift to which he had previously been assigned, whichever is higher, thereafter the employee shall receive the applicable rates for the new shift to which he is assigned. An employee who requests a shift reassignment and is reassigned as outlined herein, shall receive the applicable rates for the new shift to which he is assigned at single time only.

(4) When an employee has performed work on another job and he is directed to work on a shift job within twenty-four (24) hours after completing work on the other job, he shall receive the applicable overtime rate of his prior job or the applicable overtime rate of the shift job to which he is assigned whichever rate is higher.

(d) Any work performed on Saturday, Sunday, or a Holiday shall be paid at double the

30

hourly wage rate of the applicable shift including any premium rate.

(e) In the case of the second and third shifts and for the purpose of fringe benefit computations, each employee who works a full shift shall be considered to have worked eight (8) hours.

(f) The working hours set forth in Par. 3 and Par. 4 above may be changed by mutual agreement as provided in Article XXVI.

## ARTICLE VIII

### Repair Work

Par. 1. Repair Work is hereby defined as general repairs on apparatus enumerated in Article IV and Article IV(A) of this Agreement. Repair work shall be exclusively performed by Mechanics, Helpers and Apprentices.

Par. 2. General repairs are hereby defined as follows:

**Team repairs:**

Renewal of all ropes.
Renewal of brake linings (except small machines).
Shortening of all hoisting and counterweight cables.
Replacement of any traveling cable exceeding 50 feet in length.

31

Safety test where test weights are required.

Replacement of crosshead, counterweight or deflector sheave bearings.

Rescoring of sheaves or drums.

Replacement of worm and gears.

Rebabbitting of bearings.

Hydraulic repair work except cleaning, oiling, greasing, belts, small valves, adjusting and one man pressure relief valve test performed in accordance with Appendix A, item 22.

Adjusting or readjusting using test weights.

Realigning guide rails.

Replacing crossheads, stiles, safeties or equalizers.

Hoistway door closers with hydraulic or pneumatic checks.

All escalator and moving walk repair work must be done by a team. (Exception Article IX, Contract Service Work, callbacks and examination may be done by one person if there is no factor of safety).

Exception to above: Residence elevator as described in A.S.M.E. A17.1 code which shall be one person.

**One man repairs:**

Installing sound isolation.

Replacement of door hangers (except for freight bi-parting doors).

All door closer work (except for freight bi-parting doors).

32

Rewiring car switches, governors and selectors or any other apparatus in the car.

Refastening guide rails.

Replacing or repairing car floor covering.

Rewiring or reinstalling limit switches.

Replacing automatic rail or track oilers.

**One or Two Man Repairs:**

Armature repairs.

Renewing of car shoes or roller guides.

Repairs to cab or car gate.

Renewal of motor bearings.

Replacing thrust bearings.

Rewiring controllers.

Installation and/or replacement of the following (except when the completion of such work requires more than eight (8) hours, excluding travel time, it shall be performed by a team):

Proximity devices (door protection only).

Emergency lighting (battery chargers and lights).

Braille Plates.

Telephones/Communication Devices (with existing wiring and box in place).

Fixture Cover Plates (no wiring).

Key switches/Security devices (with existing wiring, excluding full Fireman's Service Operation).

Controller Wiring Changes (minor changes).

33

Fixture Replacement (in existing locations only).

Replacement of relays, timers, or mechanical devices with solid state devices and circuitry.

The replacement of equipment on existing elevator installations.

Other repair work assignments not listed above may be one man assignments providing there is no factor of safety involved.

**Par. 3.** When escalators are prepared and/or disassembled for cleaning, oiling, greasing, adjusting and minor replacement, (minor replacement meaning work requiring one (1) hour or less), the work shall not be classed as repair work.

When escalators are prepared and/or disassembled for cleaning, etc., purposes as mentioned above, and any replacement and/or repairs requiring more than one (1) hour, only the replacement and/or repairs shall be classed as repair work.

When escalators are prepared and/or disassembled primarily for replacement and/or repairs, all work shall be classed as repair work.

**Par. 4.** When men who are employed on contract service work perform any of the repair work listed above during hours other than be-

34

tween 6 A.M. and 6 P.M., Monday to Friday, inclusive, it shall be paid for at double the rate of single time. (Exception: employees performing one man repair while on call-backs shall be paid at 1.7 times the single time rate).

**Par. 5.** It is agreed the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M. and 6 P.M., five (5) days per week, Monday to Friday, inclusive. All other working time shall be classed as overtime and paid for at double the rate of single time.

## ARTICLE VIII(A)

### Modernization Work

**Par. 1.** Modernization work is hereby defined as any and all work performed on apparatus enumerated in Article IV and Article IV(A) in any existing or occupied building, to bring equipment up to date, including general repairs which are a part of a modernization job. However, a job which the machine is changed out or rails are removed, or new rails are installed shall be construction work. An escalator modernization shall be defined as the replacement of any or all components except the truss including general repairs which may be a part of a modernization job. Any other general repairs

35

and contract service work shall be excluded from this Article. Modernization work shall be exclusively performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

**Par. 2.** It is agreed the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M. and 6 P.M., five (5) days per week, Monday to Friday, inclusive. All other working time shall be classed as overtime and paid for at double the rate of single time.

**Par. 3.** Upon notification to the Local Business Representative or to the Regional Director, if the modernization job is outside the jurisdiction of a local union, the Company may establish shift work. Shift work shall not be permitted except in cases where at least two (2) shifts per day are established for at least five (5) or more consecutive days including Saturday, Sunday, or Holiday when worked. One of the shifts must be the "Day Shift" as defined in Par. 4 below. When special circumstances exist, such as production or operation needs of the customer, a second and third shift will be worked without any day shift when the Company and the Local Business Representative or Regional Director, if the modernization job is outside the jurisdiction of the local union, have mutually agreed that one of the

36

two (2) shifts does not have to be the "Day Shift."

**Par. 4.** It is agreed that the "Day Shift" shall consist of eight (8) hours between 8 A.M. and 4:30 P.M., five (5) days per week, Monday through Friday, inclusive.

**Par. 5.** The shift following the "Day Shift" shall work 7 1/2 hours between the hours of 4:30 P.M. and 12:30 A.M. and shall receive eight (8) hours pay plus an additional 10% per hour. The shift preceding the "Day Shift" shall work seven (7) hours between the hours 12:30 A.M. and 8 A.M. and shall receive eight (8) hours pay plus an additional 15% per hour.

**Par. 6.** Any and all work during hours other than the established hours for any one of the three shifts shall be paid at double the hourly wage rate including any premium rate of the assigned shift.

(a) When an employee is called in prior to the regular starting time for his shift or he works beyond the regular quitting time of his shift, he shall receive double the hourly wage rate of his assigned shift for all hours in excess of the established hours for his shift.

(b) When an employee is required to work hours that are not continuous with the established hours for his assigned shift he shall be paid for such hours at double the hourly wage rate of his assigned shift or double the hourly

37

wage rate of the shift on which such excess hours are performed whichever rate is higher.

(c) When the Company assigns an employee to a shift the employee shall work that shift a minimum of five (5) consecutive days. However, should the Company reassign an employee to another shift prior to working five (5) consecutive days, or within twenty-four (24) hours of completing a shift, the employee shall receive the applicable overtime rate of the new shift he is assigned to for the first day only or the applicable overtime rate of the shift to which he had previously been assigned, whichever is higher, thereafter the employee shall receive the applicable rates for the new shift to which he is assigned. An employee who requests a shift reassignment and is reassigned as outlined herein, shall receive the applicable rates for the new shift to which he is assigned at single time only.

(d) When an employee has performed work on another job and he is directed to work on a shift job within twenty-four (24) hours after completing work on the other job, he shall receive the applicable overtime rate of his prior job or the applicable overtime rate of the shift to which he is assigned whichever rate is higher.

**Par. 7.** Any work performed on Saturday, Sunday, or Holiday shall be paid at double the hourly wage rate of the applicable shift including any premium rate.

38

**Par. 8.** In the case of the second and third shifts and for the purpose of fringe benefit computations, each employee who works a full shift shall be considered to have worked eight (8) hours.

**Par. 9.** The working hours set forth in Par. 4 and Par. 5 above may be changed by mutual agreement as provided in Article XXVI.

## ARTICLE IX

### Contract Service

**Par. 1.** Contract Service is hereby defined as any contract obtained by the Company for regular examination or care of apparatus enumerated in Article IV and Article IV(A) of this Agreement and general repairs as indicated in Article VIII, Par. 2 for a period of not less than one (1) month. Contract Service Work shall be exclusively performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

**Par. 2.** Two (2) Helpers or Apprentices to each three (3) Mechanics may be employed in contract service work. The Helper or Apprentice when working with the Mechanic shall perform all work assigned to him by the Mechanic.

A 70% Helper or a second year Apprentice may work alone under the general supervision

39

of the Mechanic in his assigned district provided such Helper or Apprentice is met on the first job daily. The Helper or Apprentice shall notify the office and/or Mechanic when changing jobs and at the completion of the work day.

When working alone the Helper or second year Apprentice shall perform only oiling, cleaning, greasing, painting, replacing of combplate teeth, relamping and fixture maintenance, the inspection, cleaning and lubrication of hoistway doors, car tops, bottoms, and pits, observing operation of equipment and at no time when working alone shall such a Helper or Apprentice perform any other work or function normally performed by Mechanics. The word "District" means the regular contract service route of the Mechanic or Mechanics to whom the Helper or Apprentice has been assigned that day.

**Par. 2A.** When the Company obtains a contract that requires a Mechanic and Helper or Apprentice to be on the job and/or in a building at all times during the regular weekly working hours, such Helper or Apprentice shall not be considered as part of the two (2) to three (3) agreement mentioned above, provided no Probationary Helpers or Probationary Apprentices are assigned to such regularly scheduled work.

**Par. 2B.** Where a Local Office has contract service work requiring more than two (2) Elevator

40

Constructor Mechanics full time, the third Elevator Constructor employed in that office may be a Helper or Apprentice. A 70% Helper or second year Apprentice may work alone under the general supervision of the Mechanic in his assigned district provided such Helper or Apprentice is met on the first job daily. The Helper or Apprentice shall notify the Mechanic when changing jobs and at the completion of the work day. When working alone such Helper or second year Apprentice shall perform only cleaning, oiling, greasing, painting, replacing of combplate teeth, relamping and fixture maintenance, the inspection, cleaning and lubrication of hoistway doors, car tops, bottoms, and pits, observing operation of equipment and at no time when working alone shall such a Helper or Apprentice perform any other work or functions normally performed by Mechanics. The word "District" means the regular contract service route of the Mechanic or Mechanics to whom the Helper or Apprentice has been assigned that day. The phrase "Local Office" as mentioned in this paragraph means Local Representatives, Resident Mechanics, etc. performing contract service work as defined in Par. 1 of this Article, in a city outside the primary of a local union. (Local Representatives, Resident Mechanics, etc., as referred to above, shall be permitted to do one man or as a member of a team, team repairs, in accordance with Article VIII, Par. 2),

41

and, as a member of a team, ADA modernization and unloading of construction material. However, where a local office is located within a zoned or per diem area of a local union, the employee(s) assigned to such office shall be paid expenses in accordance with the Local Travel and Expense Agreement when performing work, as a member of a team, team repairs, ADA modernization and unloading of construction materials.

Inasmuch as Local Representatives, are on call for extended periods of time, they shall, upon request, receive a minimum of six (6) weekends per year when they are relieved of their on-call obligation. These weekends are in addition to their accrued vacation. The Local Representative must give fourteen (14) calendar days notice before each requested weekend off.

**Par. 2C.** Upon reasonable request of the International Office of the IUEC, the Company shall make available to the properly designated International Representative the information necessary to determine that all employees in a service office are being treated relative to wages, hours worked, straight time and overtime hours paid, Pension and Health Benefit Plan payments in accordance with the NEBA Agreement.

**Par. 3.** It is agreed the regular working day shall consist of eight (8) consecutive work hours,

42

with an unpaid lunch period, between 6 A.M. and 6 P.M., five (5) days per week, Monday to Friday, inclusive. Any Mechanic, Helper or Apprentice assigned regular hours beginning before 8 A.M. or ending after 5 P.M. shall be so assigned for a five (5) consecutive working day increment. It is agreed that for business reasons of the Company or personal reasons of the affected employee, the Company and the local union may modify these times.

It is agreed that in order for call-backs to be answered in downtown business areas or similar business areas, the Company may assign a Mechanic or Mechanics to remain at a mutually agreed building beyond regularly established working hours not to extend beyond 6:30 P.M. For all such work beyond his regularly established working hours the Mechanic or Mechanics shall be paid at the rate of time and one-half. Should such assigned Mechanic or Mechanics be authorized to continue work on a job when a call-back extends beyond 6:30 P.M., the man or men shall receive applicable travel time and travel expense home. Where a paid or non-paid holiday occurs, Monday through Friday, inclusive, the work performed on Saturday during the week in which any holiday occurs shall be time and one-half the single time rates.

**Par. 4.** Work performed on Sundays shall be classed as overtime and paid for at the rate of

43

double time (2X). All other time worked before and after the regular working day or in excess of eight (8) consecutive work hours with an unpaid lunch period and on Saturdays shall be at the rate of time and one-half.

**Par. 5.** Call-backs on contract service on overtime, except Sundays and holidays, shall be paid for at the rate of 1.7 times the rate of single time.

**Par. 6.** Call-backs on contract service on Sundays and holidays shall be paid for at double the rate of single time.

**Par. 7.** On contract service where the Company has a contract in one building only or adjacent buildings, for the examination and care of enough elevators to warrant keeping a man or men working continuously for sixteen (16) hours, the Company may establish a shift from 5:00 P.M. to 12:00 A.M. or 12:00 A.M. to 7:00 A.M. Pay for this work will be eight (8) hours pay for seven (7) hours worked at the regular rate of pay. Saturday, Sunday, and Holidays are classed as overtime and paid at the overtime rate. For the sixteen (16) hour calculation the seven (7) hour shift will be counted as an eight (8) hour shift.

**Par. 8.**
(a) Employees engaged in contract service work agree they will respond to call-backs

outside of their regular work hours. The Company, the local union, and the employees shall meet and cooperate in establishing a call-back system, which will cover such issues as a list of employees available on designated dates to respond to overtime call-backs, the number of employees on call-back at any given time, replacements for vacations and holidays, and trading of on-call duty. In the event the local union, the employees, and the Company cannot agree on the establishment of the call-back system, the Company and the IUEC will meet to establish the system.

Travel time from home to job and from job to home on overtime call-backs (starting after regular working hours and terminating before start of regular working hours) shall be paid for at the same overtime rate applying to the work. Travel expenses on overtime call-backs shall be paid as agreed in Local Expense Agreements.

When consecutive overtime call-backs occur, the employee shall receive the applicable overtime rate and travel expenses from home to job, from that job to one or more other jobs and then back home.

Men called out before the regular working hours shall receive the applicable travel time and travel expense from home to job. (Exception: The Company may call and instruct men to report to any given job at his regular starting time on his route in the primary).

44

45

When call-backs made during regular working hours extend into overtime and the employee is authorized to continue work, he shall receive the applicable travel time and travel expense home.

(b) Employees who are designated to be available for overtime call-backs pursuant to paragraph (a) above, or who are called out before the regular working hours, or who are on call-backs that extend into overtime, shall be entitled to and receive such compensation as described below during the period of time that such employees are responding to call-backs outside of their regular hours of work:

The rate of pay for overtime call-backs shall not be less than 1.7 times the straight time rate of pay.

The premium pay described above is made in lieu of standby pay and in recognition of the fact that contract service employees agree to make themselves available for overtime calls.

(c) It is understood and agreed that employees who are available to respond to overtime call-backs are waiting to be engaged (as defined by the Fair Labor Standards Act) by the Company. Employees who are waiting to be engaged are free to participate in personal activities; are not required to remain at home, at the Company's premises or any other specified location during the period that they are on call. Employees who are "on call" may leave the location they have indicated as the place of their primary contact. However, such employees will be available for call out by either leaving another phone number where they can be contacted or by carrying on their person a communication device such as a pager, cellular telephone, two-way radio, or other such communication device which enables the Company to contact them.

## ARTICLE X

### Designation of Helper's and Apprentice's Work and Qualifications

Par. 1. It is agreed by the Union that there shall be no restrictions placed on the character of work which a Helper or Apprentice may perform under the direction of a Mechanic. A Helper or Apprentice certified to weld shall be paid Mechanic's rate when performing welding, (excluding tack welding). However, Helpers and Apprentices on contract service work are subject to the provisions of Article IX.

Par. 2. The total number of Helpers and Apprentices employed shall not exceed the number of Mechanics on any one job, except on jobs where two teams or more are working, one extra Helper or Apprentice may be employed for the first two teams and an extra Helper or Apprentice for each additional three teams.

46

47

Further, the Company may use as many Helpers and Apprentices as best suits his convenience under the direction of a Mechanic in wrecking old plants and in handling and hoisting material, and on foundation work. When removing old and installing new cables on existing elevator installations, the Company may use two Helpers or Apprentices to one Mechanic.

**Par. 3.** A newly-hired employee without previous mechanical experience shall be classified as an Apprentice and shall work as a probationary employee in the status of an Apprentice for a period or periods totaling six (6) months within the aggregate period of not more than nine (9) months. The Company and the Union shall have the privilege of testing the ability of probationary employees during this six (6) month period. If they agree that the Apprentice during this probationary period does not display sufficient aptitude to become a first year Apprentice he shall be discharged.

Probationary Apprentices shall advance from the fifty (50) percent wage rate to the first year Apprentice's wage rate upon completion of six (6) months in the elevator industry provided such Probationary Apprentices have worked a minimum of one hundred (100) hours in each thirty (30) day period during the six (6) months. The first year Apprentice wage rate shall be effective at the beginning of the next weekly pay period following completion of the six (6) months.

It is understood that probationary employees during the probationary period above set out may be discharged or laid off at any time with or without cause and no reason need be assigned therefore, and no such discharge shall be construed as a grievance. The probationary period may be worked with more than one employer provided such employer has a labor contract with the IUEC, and the period of six (6) months probation may cover an aggregate period of not more than nine (9) months. A month shall be deemed worked when the probationary employee completes one hundred (100) hours in any thirty (30) day period.

**Par. 4.** An Apprentice may work as a Temporary Mechanic provided he/she has completed a minimum of his/her first year apprenticeship requirements, and other requirements for Temporary Mechanics prescribed from time to time by NEIEP, and upon agreement of the Employer and the Union Representative, or Regional Director if he/she works outside the jurisdiction of the Local Union, and at the same scale as a regular Mechanic. Those selected first will be Apprentices who have completed all of their apprenticeship training and are waiting to take the Mechanic's Exam. Those selected second will be workmen who have completed all of their training and failed the Mechanic's Exam and are actively participating in the educational program, they must

48

49

maintain attendance and passing requirements mandated by NEIEP. Those selected third will be fourth year Apprentices and those selected fourth will be third year Apprentices, followed by finally second year apprentices. Employers may select Apprentices and Helpers in its employ to work as Temporary Mechanics under the provisions of this paragraph if there are no qualified Mechanics available in that Local.

Apprentices serving as Temporary Mechanics will be put back to Apprentice Status when their temporary assignment is completed or within fifteen (15) working days of when the Employer is notified there is a qualified Mechanic available whichever comes first. The order for putting back Temporary Mechanics to Apprentice Status will be in reverse order; 1) second year Apprentices, 2) third year Apprentices, 3) fourth year Apprentices and 4) workmen who have completed all their training and failed the Mechanic's Examination and are actively participating in the educational program and finally Apprentices who have completed all of their apprenticeship training and are waiting to take the Mechanic's Exam.

In order to administer this procedure, NEIEP will provide to the Company on a semi-annual basis a listing of all the Employer's eligible apprentices and helpers and the modules they have completed.

It is agreed that the withdrawal of or failure to issue a Temporary Mechanic's card will not be used by the Union to advance its position with respect to a dispute unrelated to this paragraph of Article X.

No Apprentice may qualify or be raised to the capacity of Mechanic until he has worked for a period of three (3) years in the elevator industry, has successfully completed the required NEIEP courses, has been certified by NEIEP that he has completed the necessary "on the job" training and has passed a Mechanic's Examination administered by the NEIEP Director's Office. Such examination shall only be administered by NEIEP no more or no less than once every twelve (12) months in each local. The National Elevator Industry Education Program has developed and will periodically update a standardized Mechanic's Examination which will be used in each local. An Apprentice who has successfully passed a Mechanic's Examination shall become a Mechanic no later than eleven (11) months after the date of the examination. Should he fail to qualify, he cannot again take the Mechanic's Examination for a period of one (1) year.

**Par. 5.** Employees who enter the Military Service shall, upon re-employment, be accorded all rights provided by law.

**Par. 6.** Upon completion of the required classroom education program and mandatory on-the-job training (OJT) hours, all fourth (4th) year Ap-

50

51

prentices will be afforded the opportunity to sit for the NEIEP Mechanic's Exam. Those who pass the exam are elevated to the status of Mechanic, as referred to in Article X, Paragraph 4.

Those who do not sit for or who do not pass the first two scheduled Mechanic's Exams, upon completion of the required classroom education program and mandatory on-the-job training (OJT) hours shall be reclassified as a third (3rd) year Apprentice for all purposes on the following January 1st. Those third (3rd) year Apprentices who do not sit for or who do not pass the third scheduled Mechanic's Exam will be treated as a Helper for purposes of lay-off on the following January 1st. They will be subject to the Apprenticeship Program for the purposes of eligibility for taking the NEIEP Mechanic's Exam.

This status shall continue for a period not to exceed the next scheduled NEIEP Mechanic's Exam. Those who do not pass the next scheduled NEIEP Mechanic's Exam will be ineligible for employment with any NEBA Employer at the discretion of the Employer.

## ARTICLE XI

### System of Payment

**Par. 1.** It is agreed that all Mechanics, Helpers and Apprentices shall be paid weekly by

52

check, which shall be sent to any address they elect to designate other than the Company's address. Mechanics, Helpers and Apprentices shall be given the option to be paid by direct deposit or by direct mail. However, there shall be no obligation on the part of any employee or the Company to participate in the direct deposit/direct mail program and no discrimination against either one if either should elect not to participate. Once enrolled, an employee in direct deposit/direct mail program may elect to discontinue enrollment by giving the Company ten (10) working days written notice. Should a change to a time ticket be required, the Company shall notify the Mechanic and/or Helper or Apprentice in writing of the reason for such change within five (5) working days.

Mechanics, Helpers and Apprentices shall be paid by voucher on the next regular work day following the employee's regular pay day if the employee does not receive his regular pay check.

It is further agreed that in those instances where the Company is consistently unable to comply with the provisions of this paragraph, the Company shall pay each employee on the job or at the office on company time by cash or by check.

**Par. 2.** Elevator Constructors shall receive at the time of weekly payment, a check stub containing the following information:

53

1. Employee's name and social security number.

2. Total hours worked-regular and overtime, accumulative.

3. Total wages-weekly and accumulative.

4. Federal income taxes withheld.

5. FICA taxes withheld.

6. Health Benefit Plan & Pension deductions weekly and accumulative.

7. Any other authorized or legitimate deductions.

8. Vacation pay — weekly and accumulative in amount of money.

and effective January 1, 2008:

9. Annuity contributions-weekly and accumulative in amount of money

10. 401(k) deductions-weekly and accumulative in amount of money

At the time of weekly payment, at the employee's request, the Employer shall also provide the employee with a document, in writing, reporting the time the employee submitted to his Employer for that payment, regardless of whether the employee submitted his time on paper, electronically, or by any other medium.

Should the Company's payroll and/or accounting department experience a short work week due to a holiday or any other reason, the Company shall make any special arrange-

54

ments necessary to insure employees receiving pay on schedule.

## ARTICLE XII

### Vacations

Par. 1. The following plan is established for Vacation Pay: (a) A man who has worked less than five (5) years in the business shall receive Vacation Pay credit on the basis of 6% of his regular hourly rate for all hours actually worked. A man who has worked more than five (5) years in the business shall receive Vacation Pay credit on the basis of 8% of his regular hourly rate for all hours actually worked.

No Vacation Pay shall accrue for the first six (6) months worked in the business.

(b) The vacation pay accrued from January 1 of one year through June 30 of the same year shall be paid in full to the employee by July 15 of that year. The vacation pay accrued from July 1 of one year through December 31 of the same year shall be paid in full to the employee by January 15 of the succeeding year.

(c) A man with less than five (5) years in the business who works 1750 hours or more but less than 2000 hours in any vacation year shall receive at least 120 hours vacation pay. A man with more than five (5) years in the business who works 1750 hours or more but less than

55

2000 hours in any vacation year shall receive at least 160 hours vacation pay. The vacation year shall run from January 1 through December 31.

(d) Where vacation pay equal to ten (10) or more days has been accumulated for an employee with less than five (5) years of service, and fifteen (15) or more days for an employee with more than five (5) years of service such employees must take a minimum vacation of ten (10) and fifteen (15) days, respectively.

(e) The employee shall have the option of taking any additional vacation accrued in excess of the amount stated under Paragraph (d) above provided he has obtained prior approval from the Company.

(f) It is understood and agreed that work conditions must be taken into consideration when vacations are arranged.

Time off for vacation shall be taken as a full complete period whenever possible.

(g) Vacation Pay accrued will change from 6% to 8% on the first payroll period after the first month following completion of five (5) years in the business. These five (5) years include the six (6) months probationary period.

(h) The local union shall furnish the Company, on request, dates that Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices were first employed in the elevator industry.

(i) When a man leaves the Company the Vacation Pay shall be retained. He shall receive the retained amount due him at the time specified in (b) above.

(j) When a man retires from the industry, the Company shall pay any vacation pay he is owed within thirty (30) days after his retirement provided he notifies the Company in advance and in writing.

(k) Where vacations interfere by temporarily breaking up a team, the Company shall have the right to place the extra man to the Company's advantage. Serious interference shall be taken up with the Business Representative.

(l) Time spent outside the industry, whether or not a member of the local union, shall not count toward vacation eligibility status. An employee with at least one (1) year's service in the industry who takes time off for service in the Armed Services shall have such service time counted toward his vacation eligibility status upon return to the industry.

(m) Hours worked for the Company by a member of a local union, while outside of the jurisdiction of that local, shall count for vacation pay.

(n) Hours paid as holiday pay, vacation pay, or traveling time outside of the regular working hours are not to be counted as hours worked when computing vacation pay (Exception: traveling time on overtime callbacks, whether emergency maintenance or emer-

56

57

gency repair work, shall be counted as hours worked when computing vacation pay).

(o) At the time vacation pay is paid, Federal and State taxes shall be withheld on the basis of the number of weeks of vacation or portion of a week of vacation the accrued vacation pay represents. The intent of this provision is that taxes will be withheld at weekly rates rather than the higher rates for a lump sum payment of vacation pay.

## ARTICLE XIII

### Traveling Time and Expenses

**Par. 1.** When Elevator Constructors are sent outside the primary jurisdiction, but within the zoned area of the secondary, travel time and travel expense shall be paid in accordance with the Local Expense Agreement.

When Elevator Constructors are sent beyond the zoned area of the secondary jurisdiction or outside the secondary jurisdiction all travel time during the regular established work hours, Monday through Friday, inclusive, shall be paid at single time rates. Likewise, all travel time before and after the regular established work hours, Monday through Friday, inclusive, shall be paid at time and one-half rates. Further, all travel time on Saturdays, Sundays and Holidays shall be paid at

58

time and one-half rates (as agreed to in Article IX, Contract Service, travel time on overtime call-backs is excepted from the above). Expenses incurred on trip to be paid by the Company in accordance with the Local Expense Agreement.

Employees operating vehicles provided by the Company shall not be entitled to payment of wages or commuting expenses for time spent driving before or after the regular working hours from the employee's home to the first job site of the regular work day or driving from the last job site of the regular work day to the employee's home. (Note: Employees shall be reimbursed for any tolls in excess of the toll charge for passenger vehicles). This is not intended to circumvent expenses or travel time paid pursuant to Art. IX or Art. XIII and/or a Local Travel and Expense Agreement or established local practice.

**Par. 2.** Local Unions and NEBA Representatives are requested to establish zones within the secondary jurisdiction and traveling time and traveling expense allowances for each zone, consistent with existing arrangements.

**Par. 3.** When the Local Union and the NEBA Representative are unable to resolve differences regarding local travel time and travel expense agreements and presently recognized primary and secondary jurisdiction, either

59

party may request the General President, IUEC and the NEBA Executive Director to study the dispute. The General President, IUEC and the NEBA Executive Director, or their designees, shall entertain the request, and after investigation and study, are authorized to make recommendations to the Local Union and the NEBA Representative.

The General President, IUEC and the NEBA Executive Director, or their designees, may issue guidelines that the Local Union and the NEBA Representative may utilize in negotiating changes to and resolving disputes over local travel time and travel expense agreements.

All parties shall continue to work under the existing local travel time and local travel expense agreement for thirty (30) days from the date that NEBA and the IUEC are notified that the parties have reached an impasse. The General President, IUEC and the NEBA Executive Director, or their designees, may at their discretion extend the present Agreement for one additional thirty (30) day period.

## ARTICLE XIV

### Strikes and Lockouts

**Par. 1.** It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party. It is understood that this Paragraph shall be applied and construed consistent with the provisions of Article IV, Par. 11 concerning Grievance and Arbitration procedure.

**Par. 2.** No strike will be called against the Company by the Union unless the strike is approved by the International Office of the International Union of Elevator Constructors. Sufficient notice shall be given to the Company before a strike shall become effective. Except in the case of Contract Service Work as specified in Article IX of this Agreement, work stoppages brought about by lawful picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.

**Par. 3.** In the event of a strike, work stoppage or lockout affecting Mechanics, Helpers and Apprentices on New Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout, and the Union will supply competent men to the Company to do all work covered under Contract service whether such men are continuously employed in this work or not prior to the strike, work stoppage or lockout.

60

61

## ARTICLE XV

## Arbitration

**Par. 1.** Any difference or dispute regarding the application and construction of this Agreement, shall be referred to as a "grievance" and shall be resolved under the following procedure. Both parties commit to making an earnest effort to resolve differences in accordance with the procedure outlined below:

**Par. 2.** Oral Step. Any employee, local union, or the Employer with a grievance (hereinafter called the "grievant"), shall discuss the grievance with the designated Employer Representative (or Local Union Business Representative) within ten (10) working days after the cause of the grievance is known or should reasonably have been known. The Employer shall designate to each local union the Employer's Representative(s) for the purpose of responding to grievances at this step. If the grievance is initiated by an employee, the Local Business Representative shall be present during the discussion.

Within three (3) working days after the above discussion, the Employer's Representative shall notify the employee and the Local Union Business Representative of his disposition of the matter.

The Local Business Representative shall similarly respond to the Employer's grievance.

62

**Par. 3.** Written Step One. If the issue remains unresolved after the conclusion of the Oral Step, the grievant, within ten (10) working days of the conclusion of the Oral Step, may submit in writing on provided forms a brief statement of the grievance, including the Article and paragraph of the Agreement allegedly violated (if known), and the remedy requested.

Within fifteen (15) working days after the written grievance is received by the Employer (or the Union), a meeting will be held to discuss the grievance. The Employer shall be represented by the Regional Field Manager, Field Employee Relations or his designee and the designated Employer Representative described in Paragraph 2. The union shall be represented by the IUEC Regional Director or other Representative designated by the General President and the Local Business Representative described in Paragraph 2.

At the meeting (or any continuation thereof agreed to by the parties), the Employer (or the Union) shall give its written answer to the grievance on the provided form. Within ten (10) working days of that disposition, the Employer or the Union shall indicate on the grievance form whether it appeals therefrom. If the grievance disposition is not appealed, it shall be final and binding on all parties.

**Par. 4.** Written Step Two. If the grievance is appealed it shall be placed on the agenda of a

63

scheduled meeting of the National Arbitration Committee. The Employer shall be represented by the NEBA Executive Director or his designee and a panel of two (2) additional Employer Representatives. The Union shall be represented by the General President or his designee and two (2) additional representatives.

The National Arbitration Committee shall meet once per calendar quarter. Each party shall submit an agenda not less than seven (7) working days prior to the meeting.

The NEBA Executive Director or his designee (or the General President, IUEC or his designee) shall render a disposition of the grievance in writing at the National Arbitration Committee Meeting. If the grievance disposition is accepted, it shall be final and binding on all parties.

**Par. 4(A).** NEBA and the Union agree to the following program for Advisory Arbitration of grievances on a test basis. Either party may terminate the program upon ninety (90) days' written notification to the other at any time after December 31, 2008:

1. Upon the request of either party a grievance not resolved at the National Arbitration Committee (NAC) may be submitted to Advisory Arbitration by written notification to the other party within fifteen (15) working days after receipt of the other party's written disposition at the NAC level.

2. There shall be a mutually designated panel of four (4) Advisory Arbitrators, each of whom agrees to hear cases during a designated three-day week session (Tuesday through Thursday) in a designated location each year, which shall be at least thirty (30) days after receipt of the written notification that the case has been submitted to Advisory Arbitration. The thirty (30) day time limit may be waived by mutual agreement of the parties.

3. Each party (that is, NEBA and the Union) may present up to three (3) cases at each three-day session. Should either party not use its full complement of cases that week, and should the parties mutually agree, the other party may use the other's unused allotment to present additional cases.

4. Each party will be limited to three (3) attendees (counsel included) during the presentation of any case. Hearings shall be informal and the rules of evidence will not apply. No record, stenographic or tape recordings of any session will be made.

5. The parties will not use the traditional means of presenting evidence, there will be no witness testimony, either direct or cross examination. The spokesman for each side will present its case by way of summary presentation that combines elements of opening statement, proffers of evidence, and closing argument, all in a single narrative. The spokesman may offer documents (without formal authentication),

64

65

and summarize the testimony of potential witnesses. A pre-hearing brief limited to ten (10) pages in length may be offered at the hearing. Each side's initial presentation will be limited to one (1) hour, with an opportunity provided for rebuttal and follow-up. The Advisory Arbitrator may ask questions of anyone present. Each case shall be concluded within four (4) hours. There will be no post-hearing briefs.

6. At the conclusion of the hearing in any case, the Advisory Arbitrator shall endeavor to advise the parties orally what his Advisory Opinion would be in the case. At the request of any party, the Advisory Arbitrator shall issue a written Advisory Opinion which shall be labeled in bold letters at the top of the opinion "Advisory Non-Binding Opinion", within thirty (30) days, which shall be an opinion of ten (10) pages or less.

7. Nothing said by the parties or their representatives during the Advisory Arbitration process, nor any pre-hearing brief or position statement introduced during a case, can be used or introduced by the other party during Impartial Arbitration proceedings or in any other proceeding. Nor may the Advisory Arbitrator's Advisory Opinion, whether delivered orally or in writing, be used, introduced or disclosed during Impartial Arbitration or in any other proceeding.

8. It is the mutual intent and desire of the parties that following the presentation of a case at Advisory Arbitration, the parties themselves will agree upon final resolution of the case, in accordance with the Advisory Arbitrator's Advisory Opinion, or some variation thereof. However, should that not result, either party may refer a case heard at Advisory Arbitration to Impartial Arbitration under Paragraph 5 of this Article, by written notice to the other party within thirty (30) days of the Advisory Arbitration hearing or receipt of the Advisory Arbitrator's written Advisory Opinion, whichever is later, unless the parties mutually agree to extend said time.

Any Advisory Arbitrator hearing a case at Advisory Arbitration shall be disqualified from hearing the same case at Impartial Arbitration.

9. The cost of the Advisory Arbitrators and the hearing arrangements shall be mutually borne by the parties.

**Par. 5.** Impartial Arbitration. If the grievance is not settled by the National Arbitration Committee, the Union or the Employer, within fifteen (15) working days of the Employer's (or Union's) disposition as outlined in Paragraph 4, may appeal the grievance to impartial arbitration. Such appeal shall take the form of a letter to the NEBA Executive Director (or the General President, IUEC).

**Par. 6.** The parties shall mutually agree upon the selection of an impartial arbitrator. If, within

66

67

fifteen (15) days, the parties are unable to agree on the person to be selected as arbitrator, the parties shall jointly request to submit the matter to arbitration conducted in accordance with the Labor Arbitration Rules and Procedures of the American Arbitration Association and by an arbitrator who is a member of the National Academy of Arbitrators.

The arbitrator shall render his decision immediately upon the close of the record if the parties mutually agree otherwise the decision shall be rendered within thirty (30) days of the close of the record or the receipt of the briefs if the parties desire to file briefs. In an arbitration, either party may rely upon Articles in the Agreement other than those set forth in the original grievance form. The decision of the impartial arbitrator shall be final and binding on all parties.

**Par. 7.** It is understood that the arbitrator does not have the authority to add to, subtract from or modify in any way the provisions of this Agreement.

**Par. 8.** Grievances of the Union or the Employer shall originate at Written Step Two by submission to the NEBA Executive Director (or the General President, IUEC). The grievance of an IUEC Regional Director shall be filed and processed beginning at Written Step One of the procedure.

**Par. 9.** Discharge Grievances Expedited Impartial Arbitration. Recognizing the special nature of cases involving the discharge of an employee, the parties agree that such case(s) shall be handled as follows:

(a) Any discharge grievance not resolved at the Written Step One meeting may immediately be referred by either party to the NEBA Executive Director or his designee and the General President, Union or his designee for their immediate review and discussion. Such grievance need not wait to be placed on the agenda of the scheduled National Arbitration Committee, but rather shall be discussed, either in person or by telephone, by the parties within ten (10) working days of the referral from Written Step One. The parties shall make an earnest effort to resolve their differences at this meeting, but failing such agreement, either party may request immediate, expedited impartial arbitration.

(b) Within ten (10) working days of a request for impartial arbitration by either party, the parties shall mutually agree upon the selection of an impartial arbitrator who shall be obliged to schedule a hearing at the earliest possible available date on his/her schedule where both parties are available to present their respective cases. The arbitrator shall hear the case. Post hearing briefs must be submitted within two (2) weeks of the conclusion of the hearing. The arbitrator shall render the

68

69

award within two (2) weeks of the submission of briefs. Post hearing briefs may be waived by mutual agreement of the parties.

**Par. 10.** Compensation and expenses of the arbitrator shall be shared equally between the Employer and the Union.

**Par. 11.** Any of the time limits contained herein may be mutually extended by the representatives of the parties. Failure to appeal the grievance within the time limits described above without mutual agreement shall be considered an abandonment of the grievance. If a grievance is not dispositioned within the above time limits, it shall be immediately processed to the next step of the procedure.

## ARTICLE XVI

### Jurisdictional Territory

**Par. 1.** The primary jurisdiction of any local union shall include only that territory in which its members will agree to travel on their own time.

The secondary jurisdiction shall include the balance of the territory now within the jurisdiction of the local union.

**Par. 2.** Any change to the present jurisdiction of a local must be approved by the International

70

Union of Elevator Constructors and the NEBA Executive Director before becoming effective.

**Par. 3.** The primary jurisdiction of Local No. _____ of the City of _____, relative to the wage scale and working conditions shall include the following territory: ____

_____

The secondary jurisdiction of Local No. _____ of the City of _____, relative to working conditions shall include the following territory: _____

**Par. 4.** The parties agree that they meet annually and by mutual agreement more often, if necessary to discuss jurisdictional issues. The parties agree to fairly act upon justifiable written requests by Local Unions for extensions of existing jurisdictions. The Company and the IUEC shall advise a Local Union within sixty (60) days after the meeting at which the request is considered, of its disposition of the request.

When opening a Local Office the following steps shall be followed:

1. The Company shall notify the Local Business Manager/Representative when opening a new "Local Office" in a Local Union's secondary jurisdiction or open territory.

2. The Company shall bargain with the Local Business Manager/Representative or International when considering the assignment of a bargaining unit employee to a Local Office. No

71

bargaining unit employee will negotiate directly with the Company.

3. The Company agrees to make forty (40) hours per week available to the first employee assigned to a Local Office. As each additional employee is assigned to such office thereafter, the Company agrees to make not less than thirty-two (32) hours of work available to the most recent addition and forty (40) hours per week available to all but the last employee so assigned.

4. Local Office employees will perform work per Article IX, Par. 1 and Article IX, Par. 2B.

5. Local Office employees shall not perform work in the primary of a local union unless mutually agreed to by the Company and the Local Business Manager/Representative.

6. Local Office Employees shall perform their work in accordance with the NEBA National Agreement at all times.

## ARTICLE XVII

### Health Benefit Plan

**Par. 1.** The Health Benefit Plan covering life insurance, sickness and accident benefits, and hospitalization insurance, or any changes thereto that are in accordance with the National Elevator Industry Health Benefit Plan and Declaration of Trust, shall be a part of this

72

Agreement and adopted by all parties signatory thereto.

**Par. 2.** The Health Benefit Plan shall be financed by mutual contribution, of Employers and Elevator Constructor Mechanics, Helpers and Apprentices as provided herein. The Employer agrees to continue to pay and contribute eight dollars and twenty seven and one half cents ($8.275) for each hour of work performed by all Elevator Constructor Mechanics, Helpers and Apprentices in its employ. The eight dollars and twenty seven and one half cents ($8.275) hourly contribution rate shall increase upon every anniversary of the wage rate change of each Local Union, in accordance with the following (except as modified pursuant to Article V, Paragraph 3):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| January 1, 2008 | $0.50 | $ 8.775 |
| January 1, 2009 | $0.75 | $ 9.525 |
| January 1, 2010 | $0.50 | $10.025 |
| January 1, 2011 | $0.50 | $10.525 |
| January 1, 2012 | $0.50 | $11.025 |

Each Elevator Constructor Mechanic, Helper and Apprentice shall continue to contribute three and one-half cents ($.035) per

73

hour. Payments of said contributions by the Employer and Elevator Constructor Mechanics, Helpers and Apprentices shall be in accordance with the National Elevator Industry Health Benefit Plan and Declaration of Trust.

**Par. 3.** It is understood and agreed that the contributions provided for in Par. 2 shall be used by the Trustees to maintain the plan of benefits provided by the Health Benefit Plan to the extent that it is feasible to do so on a sound financial basis without any increase in said hourly contribution rates during the term of this Agreement (except as modified by Article V, Par. 3).

**Par. 4.** It is understood and agreed that the decision(s) to increase or decrease the benefits provided by the Health Benefit Plan are matters committed to the discretion of the Trustees, except that the Trustees should not make any change in the plan of benefits which would result in the need for an increase in the contribution rates set forth in Par. 2. It is further understood and agreed, that the Actuary of the Health Benefit Plan shall continuously monitor the financial condition of the Health Benefit Plan and shall promptly advise the Trustees whenever in the opinion of the Actuary, it is necessary for the Trustees to modify benefits provided by the Health Benefit Plan in order to maintain the Health Benefit Plan in sound financial condition without any in-

74

crease in the hourly contribution rates set forth in Par. 2. The Actuary shall report to the Trustees with respect to such matters at least once each year as soon as is feasible after the financial and actuarial information for the Health Benefit Plan as of the end of the plan year is available.

**Par. 5.** In no event shall a contribution rate of the Company exceed the lowest contribution rate paid by any other contributor to the Health Benefit Plan for the type of work covered by this Agreement.

## ARTICLE XVIII

### Pension Plan

**Par. 1.** The National Elevator Industry, Inc., and the International Union of Elevator Constructors shall continue the Pension Trust Fund known as the "National Elevator Industry Pension Plan," which is administered by a board of eight (8) Trustees, four (4) appointed by the National Elevator Industry, Inc., and four (4) appointed by the International Union of Elevator Constructors. The Board of Trustees have adopted a Declaration of Trust and Plan of Pension Benefits which shall be a part of this Agreement and binding on all parties signatory to this Agreement.

75

The normal retirement age of the Pension Plan is sixty-five (65) years of age.

Par. 2. The Plan of Pension Benefits shall be financed by contributions as provided herein. The Company agrees to continue to pay and contribute four dollars and forty six cents ($4.46) for each hour of work performed by all Elevator Constructor Mechanics, Helpers and Apprentices in its employ.

The four dollars and forty six cents ($4.46) hourly contribution shall increase upon every anniversary of the wage rate change of each Local Union, in accordance with the following (except as modified pursuant to Article V, Paragraph 3):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| January 1, 2008 | $0.50 | $4.96 |
| January 1, 2009 | $0.50 | $5.46 |
| January 1, 2010 | $0.50 | $5.96 |
| January 1, 2011 | $0.50 | $6.46 |
| January 1, 2012 | $0.50 | $6.96 |

Payments of said contributions by the Company shall be in accordance with the terms of the Declaration of Trust adopted by the Board of Trustees. However, in no event shall contri-

butions by the Company exceed the lowest contribution paid by any employer contributor to the Pension Plan for the type of work covered by this Agreement performed in the same geographical jurisdiction of a given local.

Par. 3. Under the terms of this Agreement, including the agreed-upon contribution rate to the Pension Plan, it is the understanding and intention of the parties that the Trustees of the Plan, in fulfilling their duties as Trustees, will operate and administer the Pension Plan in a sound fiscal manner and in accordance with the Agreement and Declaration of Trust. It is the intention of the parties that the Trustees will annually review the applicable benefit rates of the Plan, and following such review, may increase the benefit rate to a level such that the funding period will be fifteen (15) years or less, so that neither withdrawal liability nor an unfunded vested liability will be created and so that the Plan will remain comfortably in the "green zone" under the rules of the Pension Protection Act of 2006, that is, the Plan will stay outside of "endangered" and "critical" status as defined by the Pension Protection Act. Each year, as soon as feasible after the financial and actuarial information for the Plan as of the last day of the prior Plan Year is available, the Plan actuary shall advise the Trustees with respect to the funding of the Plan, taking into account the criteria set forth in this paragraph.

## ARTICLE XVIII(A)

### 401(k) Annuity

The National Elevator Industry 401(k) Retirement Plan shall have a provision added to enable the Plan to accept annuity contributions and shall be known as the Elevator Constructors Annuity and 401(k) Plan.

The Plan shall be administered by a board of eight (8) Trustees; four (4) appointed by the International Union of Elevator Constructors and four (4) appointed by the National Elevator Industry, Inc.

The Board of Trustees shall adopt a Declaration of Trust and Plan of Benefits which shall be part of this Agreement and binding on all parties signatory to this Agreement.

The annuity benefits shall be funded by Employer contributions as follows (except as modified pursuant to Article V, Paragraph 3):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| January 1, 2008 | $0.25 | $1.85 |
| January 1, 2009 | $0.50 | $2.35 |
| January 1, 2010 | $0.50 | $2.85 |
| January 1, 2011 | $0.50 | $3.35 |
| January 1, 2012 | $0.50 | $3.85 |

78

## ARTICLE XIX

### Educational Fund

**Par. 1.** The National Elevator Industry, Inc., and the International Union of Elevator Constructors have established an Education Trust Fund administered by a joint board of trustees. The Educational Trust Fund known as the "National Elevator Industry Education Program" shall provide an apprenticeship program for the education and training of Apprentices as well as a continuing education program for elevator Mechanics. Such Fund has been established pursuant to and in compliance with the provisions of Section 302 of the Labor-Management Relations Act, as amended.

**Par. 2.** The apprenticeship program called for herein shall be for a period of four (4) years and shall in all respects conform to the regulations of the United States Department of Labor and/or applicable state apprenticeship councils governing registered apprenticeship programs. The pattern standards for the apprenticeship program are set forth in the National Guidelines for Apprenticeship Standards and are incorporated herein. Through coordination with the Director of the National Elevator Industry Education Program, local committees consisting of representatives of employers signatory to this Agreement and IUEC Local Unions, shall prepare and submit for approval

79

to the applicable state apprenticeship councils such documents as may be necessary to secure registration of the apprenticeship program called for herein. Upon the approval of the parties hereto, such committees may alter the program of apprenticeship set forth in the National Guidelines for Apprenticeship Standards if in their opinion such alterations are called for by applicable state law.

**Par. 3.** The Board of Trustees of the Education Trust Fund shall have full authority and discretion to adopt Agreements and Declarations of Trust and educational and training programs which shall become a part of this Agreement and binding on all parties to the Agreement. Individuals, Companies and Local Unions may appeal decisions of a Local Joint Apprenticeship Committee to the Board of Trustees of the Educational Trust Fund which may review, modify or set aside such decision and order relief as appropriate. This provision of this Article shall be effective to the extent permitted by applicable law.

**Par. 4.** The National Elevator Industry Education Program shall be financed by contributions by Employers as provided. Upon the effective date of this Agreement the Company agrees to continue to pay and contribute to such Fund fifty - five cents ($.55) per hour for each hour of work performed by all Elevator Constructor Mechan-

ics, Helpers and Apprentices. The amount of the Company contribution will be as follows (except as modified by Article V, Par. 3):

| Effective Date | Amount of Increase | Hourly Contribution Rate |
|---|---|---|
| July 9, 2007 | $0.00 | $0.55 |
| January 1, 2008 | $0.00 | $0.55 |
| January 1, 2009 | $0.00 | $0.55 |
| January 1, 2010 | $0.00 | $0.55 |
| January 1, 2011 | $0.00 | $0.55 |
| January 1, 2012 | $0.00 | $0.55 |

Payment of said contributions shall be in accordance with the terms of the Declaration of Trust adopted by the Board of Trustees. However, in no event shall contributions by the Company exceed the lowest contribution paid by any employer contributor to the Fund.

**Par. 5.** It is understood and agreed that if prior to any calendar year the Trustees shall advise the IUEC and NEBA that the amount of the contributions set forth in Par. 4 above are providing more than sufficient funds to finance and maintain the existing education program, then the IUEC and NEBA shall meet to discuss and agree upon whether the amount of the Companies' contributions to the Education Plan should be reduced and the wage rate of

80

81

Elevator Constructor Mechanics, Helpers and Apprentices increased by the amount of any agreed upon reduction.

It is also understood and agreed that if at any time the Trustees of the Education Plan shall advise the IUEC and NEBA that the Education Plan does not have sufficient funds to maintain the existing education program, then the IUEC and NEBA shall meet to discuss and agree upon whether the amount of the Companies' contributions to the Education Plan shall be increased. In no event shall the Companies' contribution exceed the lowest contribution paid by any employer contributor to the Education Plan.

## ARTICLE XX

### Elevator Industry Work Preservation Fund

**Par. 1.** The Elevator Industry Work Preservation Fund shall be funded by a contribution of eighteen cents ($0.18) per hour and continued each year thereafter for each hour of work performed by each employee covered by this Agreement to the Elevator Industry Work Preservation Fund (except as modified by Article V, Par. 3). Except for the transfer of contributions described in Section 5 below, the monies of the Fund shall be at all times segregated from other Union or Employer assets, and shall not be used or controlled by the Union or Employers party to this Agreement, but shall be administered solely by the Trustees and its duly authorized representatives for the purposes permitted.

**Par. 2.** The Fund shall be governed by a written Trust Agreement and administered by a Board of Trustees, in accordance with, and so provided in, the governing documents of the Fund and subsequent amendments thereto.

**Par. 3.** The assets of the Fund shall be used for any purpose authorized by Section 6(b) of the Labor-Management Cooperation Act of 1978 and Section 302(c)(9) of the Taft Hartley Act, 29 U.S.C. Section 186(c)(9). The Fund shall not be used for any other purpose, including a purpose which is inconsistent with the provisions of this Agreement, or used for the purpose of funding any lobbying effort or participation in any litigation, or administrative proceeding in which the Fund is seeking or supporting a result which is contrary to the interests of any Employer signatory to this Agreement, or used in connection with an organizational campaign to organize any employees of an Employer which is bound by the terms of this Agreement in a job classification other than the classifications of Elevator Constructor Mechanic, Elevator Constructor Helper and Elevator Constructor Apprentice.

**Par. 4.** No Employer signatory to this Agreement shall be obligated to provide information

82

83

to the Union or to the Fund with respect to any matter which the Fund may be reviewing or pursuing or otherwise related to the activities of the Fund, nor shall any Employer signatory to this Agreement be obligated to participate in any of the activities of the Fund in any other manner. The Trustees of the Fund shall not take any action which directly or indirectly changes any of the Articles or intent of this Agreement, nor shall any provision of this Article be construed to change the meaning or intent of any other Article of this Agreement.

**Par. 5.** Contributions to the Elevator Industry Work Preservation Fund will be reported on and transferred on a monthly basis using the Monthly Remittance Report to the National Elevator Industry Benefit Funds (NEIBF), which will in turn segregate and deposit the contributions to the Work Preservation Fund in that Fund's separate account.

## ARTICLE XXI

### Payment for Lost or Stolen Tools

**Par. 1.** The Company agrees that they should make every effort to provide a reasonably safe place for tools and likewise the employee shall make every effort to protect not only his own tools but also to protect the Company tools. The Company and the local union agree to jointly re-

84

imburse Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices for tools lost on the job or stolen while in transit or stolen from any vehicle being used by the employee on the following basis:

a) Up to a maximum claim of $200, the Company will pay 75% and the local union will pay 25%.

b) On claims of more than $200, the local union will pay $50 with the remainder, up to a maximum of $900, paid by the Company.

Alternatively, the Company may elect to list those tools which its employees are required to utilize. In that event the Company shall not be required to reimburse its employees for other than those tools it shall require.

Actual receipts for replacement tools must be submitted, in either case, to the local union and the Company by the Employee claiming the loss before reimbursement can be authorized. The local union and the Company reserve the right to inspect replacement tools.

## ARTICLE XXI (A)

### Metric Tools

When and if the Company requires the use of metric tools by an employee in the course of his employment, the Company agrees, upon receipt from the employee, to reimburse the em-

85

ployee for all tools required or to provide such tools, at the Company's option.

## ARTICLE XXII

### Hiring, Layoffs and Transfers

**Par. 1.** In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of employment of applicants and of preventing discrimination because of age, citizenship, disability, race, color, creed, sex, religion or national origin, the parties hereto agree to the following system of employment:

(a) The Union shall establish, maintain and keep current an open list for the employment of workmen qualified to perform the duties required. Such list shall be established, maintained and kept current on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, Union By-Laws, regulations or constitutional provisions or any other aspect or obligation of Union membership, policies or requirements. Upon request such list shall be made available to the Company for inspection. An employee who does not meet the requirements set forth in the Substance Abuse Program will be deemed unqualified and not placed on any list for referral or referred out to any company.

(b) The Company shall hire experienced Mechanics, Helpers and Apprentices who permanently live in the area, are seeking employment and are qualified to perform the work required by the Company before hiring a transient employee or a new inexperienced employee. An employee shall be considered a transient until he makes a showing that he is permanently changing his home and residing in the territorial jurisdiction of the local with which he has registered for referral. The employee shall verify the change by providing to the local, a motor vehicle registration and drivers license with the new address. The employee shall send the change of address to the International in order to be registered with the local for referral. Provided the foregoing criteria are met, an employee's status as a transient shall continue for a period of six (6) months from the time he has registered with the local. When hiring an experienced Mechanic, Helper or Apprentice the Company shall use the Union as the first source of applicants for employment. Upon the Company's request, the Union shall refer, on the basis set forth hereinafter, such an applicant within a period of 72 hours after such request, exclusive of Saturdays and Sundays. When seeking Apprentice applicants, the Company will utilize the list provided by the Local Joint Apprenticeship Committee (JAC). If the Union or JAC fails to refer qualified workmen within the specified

86

87

period the Company may obtain workmen from any other available source. The Company has the right to reject any and all applicants referred to it by the Union. The Company, where requested by the Union, shall give, in writing, the reason for any rejection. It is further understood and agreed that if any workman is continually rejected by the Company within a local union's jurisdiction or if the Company, as a matter of practice, repeatedly rejects applicants referred by the Union, the local union Business Representative or the Company may submit the matter of rejection to the designated Company Labor Relations Representative and IUEC Regional Director. Failing agreement, the matter may be referred to the National Arbitration Committee under Article XV. The Company Labor Relations Representative and IUEC Regional Director, National Arbitration Committee or the impartial arbitrator shall have authority to decide the matter and impose an appropriate remedy. If they find that the continued rejection of a particular workman was justified, the appropriate remedy may include directing the removal of the named workman from the list for a period of time. If they find that the Company has unreasonably or discriminatorily exercised its right of rejection, the appropriate remedy may include directing that the Company not have a right of exercising his right of rejection for a period of time.

88

(c) The Union shall refer to the Company only workmen whose names appear on the open employment list and in so doing shall be governed by the following criteria:

(1) If the Company requests by name from the open employment list a particular workman previously employed by the Company, who permanently lives in the area, that workman shall be referred by the Union to the Company unless the workman is unwilling to accept employment with the Company.

(2) If the Company requests by name from the open employment list a particular workman who has not previously been employed by the Company, who permanently lives in the area, that workman shall be referred by the Union to the Company unless the workman is unwilling to accept employment with the Company.

(3) When hiring an experienced Apprentice from the local open employment list, the Company will first hire those classified as fourth year Apprentices whose names appear on the open employment list. Thereafter, the Company may select and hire or reemploy any Apprentice. However, at its sole discretion, the Company may select and rehire or reemploy any Apprentice who has previously worked for the Company during the immediately preceding twelve (12) month period, irrespective of the availability of any fourth year Apprentice.

(4) In the event the General President of the

89

IUEC shall be of the opinion that a severe unemployment situation exists in any local's jurisdiction, he shall contact the NEBA Executive Director and confer with him as to the problem and possible resolutions. Failing agreement the matter may be submitted to the impartial arbitrator as provided under Article XV. An agreement as to resolution of the problem between the General President of the IUEC and the NEBA Executive Director or the decision of the arbitrator may modify the provisions of subparagraph (1) and (2) above as may be deemed necessary under the circumstances.

(d) All Employment Practice provisions are to be posted in the Union Hall and in the Company's Personnel Office.

(e) As soon as practical the General President of the IUEC shall review all locals of the Union where there is a part-time Business Representative for the purpose of determining whether such Business Representative is able to establish and maintain an open employment list and to operate the procedures in this Article in a satisfactory manner. He shall then advise the NEBA Executive Director as to such determination and if there is any disagreement, they shall endeavor to resolve the matter. Failing agreement, the matter may be submitted to the impartial arbitrator provided under Article XV.

90

**Par. 2.** Applicants for apprenticeship shall be evaluated and ranked in accordance with the selection procedures contained in the pattern affirmative action plan set forth in the National Guidelines for Apprenticeship Standards, as they may be amended from time to time, or such similar procedures adopted to conform to applicable state laws or regulations, by local committees consisting of representatives of IUEC Local Unions and Employers signatory to this collective bargaining agreement. Employers seeking new employees shall contact the appropriate local committee for dispatch of an Apprentice in accordance with that committee's referral procedures. The Local Union and the Companies are entitled to a copy of the complete ranked applicant list. If applicants for Apprenticeship are not referred from the Apprentice applicant list, the Employer may obtain Apprentices from any other available source.

**Par. 3.** When an Employer makes layoffs, the probationary Apprentice will be laid off first; thereafter, any transient Helper, then any transient Apprentice, followed by any Helper who permanently lives in the area; thereafter, a first year Apprentice; thereafter, a second year Apprentice; thereafter, a third year Apprentice and thereafter, a fourth year Apprentice. The Employer will determine the order of lay off in each classification. Employees laid off shall be paid at the next weekly payroll period following the layoff.

91

The Temporary Mechanic shall be set back in the same order as mentioned in Article X, Par.4 prior to layoff of a transient Mechanic, not including temporary transfers referred to in paragraph (4) below, and lastly those Mechanics who permanently live in the area will be laid off.

**Par. 4.** The Company shall have the right to transfer temporarily from one local union's jurisdiction to another, key Mechanics (such as adjustor, certified welder, Mechanic-In-Charge, experienced escalator Mechanic, Mechanic trained to handle special equipment such as hydro drilling equipment, Mechanic required to train or orient other employees in that local union's jurisdiction as to the Company's equipment, Mechanic transferred temporarily to open an office). A Mechanic-In-Charge is only on a construction or modernization job where there are four (4) or more Elevator Constructors including the Mechanic-In-Charge. In addition, where the Company does not have a regular work force, the Company shall have the right to transfer Mechanics temporarily on a one-to-one basis in the case of two (2) man jobs up to a maximum of three (3) such jobs at any given time. It is understood that the foregoing limitations shall not be applicable where there are no qualified Mechanics available in the local union. Mechanics temporarily transferred under the above provisions may remain in the area only until completion of their work on the particular job for which they have been transferred.

The Company and the IUEC shall mutually decide upon what is a regular work force as used in this Par. 4 and that decision shall become incorporated in and a part of this Agreement.

**Par. 5.** Where the Company is opening a new office in one local union's jurisdiction they may permanently transfer one Mechanic from the jurisdiction of another local union to start the new office provided they have advised the Business Representative in advance of the transfer. The Company may permanently transfer an employee from one local union to work in the jurisdiction of another local union subject to the following conditions:

(a) Prior notice shall be given to the International Union.

(b) The Company shall consider the following factors in reaching a decision to transfer such an employee:

1. The availability of qualified personnel in the other local union.

2. The business necessity for such a transfer and other relevant considerations.

(c) The Company shall not permanently transfer any employee for the purpose of circumventing an expense agreement.

92

93

(d) Any dispute concerning such a transfer shall be subject to the grievance and arbitration procedure herein.

(e) It is understood and agreed that prior to terminating an employee for unsatisfactory performance who is to be replaced under this paragraph or any other employee, the Company will give a written warning to the employee with a copy to the Business Representative in order that the employee be given an opportunity to improve his work performance. Such a termination may be submitted as a grievance to the National Arbitration Committee as provided under Article XV as a final source of appeal.

**Par. 6.** Whenever a building owner or other customer of the Employer requires persons working on its premises to provide personal identification as a condition of entering or working on the premises, the Employer will provide the employee with such identification for use on such jobs which will not contain the employee's Social Security, driver's license or any other personal identification numbers of the employee.

## ARTICLE XXIII

### Scope and Terms of Agreement

**Par. 1.** This Agreement shall be binding upon all Employers and the local unions which are named in the attached lists. This Agreement shall be incorporated in and become a part of any Agreement entered into between the Employers and the local unions of the International Union and no local Agreements between the Employers and local unions shall be made changing this Agreement except as herein provided for in Article XXVI. No local union shall, through its by-laws, constitution, or otherwise, change any of the Articles or intent of this Agreement. Nor shall the Employers make any rules or issue any instructions that are contrary to this Agreement.

This Agreement defines the entire relationship between the parties for the term of this Agreement and, except as herein specifically provided for, neither party shall during the term of this Agreement have any obligation to bargain with respect to any matter not covered by this Agreement nor concerning any change or addition hereto.

## ARTICLE XXIV

### Re-Opening Clause

**Par. 1.** NEBA and the Union agree that if the Labor Management Relations Act of 1947 is repealed, modified or amended in any respect, the Union and NEBA agree that upon service of a thirty (30) days notice by either party, this

94

95

contract may be reopened for negotiation dealing with Union security or secondary strikes, that will be covered by the repeal, modification or amendment of that Act.

# ARTICLE XXV

## Termination of Agreement

**Par. 1.** This Agreement shall become effective on the Ninth day of July 2007, and shall terminate at midnight on the Eighth day of July 2012.

# ARTICLE XXVI

## Local Option

**Par. 1.** It is agreed between the Company and the Union that in order to more effectively compete or to address other local conditions to benefit the entire elevator industry, it is permissible for any local union to negotiate special conditions with the Company for the following classes of work, except that the wage rate as determined by Article V of this Agreement may not be changed:
1. Modernization Work
2. General Repairs
3. Contract Service
4. Construction Work

96

Special conditions include but are not restricted to such items as terms associated with Local Transportation and Expense Agreements, work jurisdiction associated with Article IV of this Agreement, staffing, premium rates of pay, shift work or working hours on Modernization, Construction, Repair and Contract Service. In the case of Contract Service, special conditions shall also include problems arising because of areas where an employee's physical well-being may be in jeopardy.

**Par. 2.** The above mentioned special conditions shall be negotiated by a Committee of two (2) Representatives from the local Union, one (1) International Representative and three (3) Representatives from the Company and their decisions shall be binding on both parties.

**Par. 3.** Agreement on special conditions shall continue as long as satisfactory to both parties, but no change shall be made more often than six (6) months except that changes in construction working hours may be changed more often if mutually agreed. Sixty (60) days notice in writing shall be given by the party desiring such changes and such written notice shall constitute cause for a meeting of both parties.

**Par. 4.** Both parties commit to making an earnest effort to reach an agreement, however, when the Local Union Representative and the Com-

97

pany's designated representative are unable to resolve a dispute over changes in the Local Option Agreement as provided in this Article, either party may request the General President of the IUEC and the NEBA Executive Director to review, make recommendations or issue guidelines to resolve the dispute.

## ARTICLE XXVII

### Reporting Time, Subpoenaed Witnesses, Uniforms

**Par. 1.** Whenever a Mechanic, Helper or Apprentice covered by this Agreement reports to work on a construction, service or maintenance job on request of the Company and there is no work available, except for reasons beyond the control of the Company, the employee shall receive two hours pay at straight time rates.

**Par. 2.** Any employee who is covered by this Agreement who is subpoenaed to court by the Company or by the Company's Counsel shall be paid for all time at the straight time hourly wage rate, fringe benefits, and all reasonable expenses.

**Par. 3.** When required by the Company, Elevator Constructor Mechanics, Helpers and Apprentices shall wear uniforms bearing the Com-

98

pany's name and/or trademark. Such uniforms shall be furnished by the Company at no cost to the employee.

**Par. 4.** Whenever the Company asks an employee to work with cleaning solvents or other materials and substances that pose a risk to life or health, the Company will first advise the employee of the risks and train the employee in proper use or handling of the materials and substances. The contents of all such materials and substances and their possible risks and adverse effects shall be clearly marked on their containers. Suitable protective clothing and equipment must be provided to employees handling such materials and substances.

IN WITNESS WHEREOF, the parties hereunder have set forth their hand and seal on the date stated above.

---

For:
National Elevator Bargaining Association

By:
E. James Walker
Henry P. Bechard
Michael Shields
Joseph Zaffuto

99

**EMPLOYER MEMBERS OF NATIONAL ELEVATOR BARGAINING ASSOCIATION**

KONE Inc.
One Kone Court
Moline, IL 61265

Otis Elevator Company
One Farm Springs Road
Farmington, CT 06032

Schindler Elevator Corporation
20 Whippany Road
Morristown, NJ 07960-4539

Fujitech

Mitshbishi

North American Elevator Services

**INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS**

By:
Dana A. Brigham,
    General President
Timothy R. Smith,
    Assistant General President
Kevin P. Stringer,
    General Secretary-Treasurer
Mike Avery,
    Labor Committee
James K. Bender II,
    Labor Committee
Bernie F. Carey,
    Labor Committee
Dale E. Coalmer,
    Labor Committee
Michael J. Langer,
    Labor Committee
Patrick J. McGarvey,
    Labor Committee
Larry J. McGann,
    Regional Director
William R. Johnston, Jr.,
    Secretary-Treasurer, IUEC Local #5
R. Allen Spears
    National Coordinator, EIWPF

100

101

## LOCAL UNIONS
## OF
## INTERNATIONAL UNION OF
## ELEVATOR CONSTRUCTORS

Local No.   1, New York, NY
Local No.   2, Chicago, IL
Local No.   3, St. Louis, MO
Local No.   4, Boston, MA
Local No.   5, Philadelphia, PA
Local No.   6, Pittsburgh, PA
Local No.   7, Baltimore, MD
Local No.   8, San Francisco, CA
Local No.   9, Minneapolis, MN
Local No. 10, Washington, DC
Local No. 11, Cincinnati, OH
Local No. 12, Kansas City, MO
Local No. 14, Buffalo, NY
Local No. 15, Milwaukee, WI
Local No. 16, New Orleans, LA
Local No. 17, Cleveland, OH
Local No. 18, Los Angeles, CA
Local No. 19, Seattle, WA
Local No. 20, Louisville, KY
Local No. 21, Dallas/Fort Worth, TX
Local No. 23, Portland, OR
Local No. 24, Birmingham, AL
Local No. 25, Denver, CO
Local No. 27, Rochester, NY
Local No. 28, Omaha & Lincoln, NE and
Council Bluffs, IA
Local No. 30, Memphis, TN

102

Local No.  31, Houston, TX
Local No.  32, Atlanta, GA
Local No.  33, Des Moines, IA
Local No.  34, Indianapolis, IN
Local No.  35, Albany, NY
Local No.  36, Detroit, MI
Local No.  37, Columbus, OH
Local No.  38, Salt Lake City, UT
Local No.  39, Providence, RI
Local No.  41, Springfield, MA
Local No.  44, Toledo, OH
Local No.  45, Akron, OH
Local No.  48, Charleston, WV
Local No.  49, Jacksonville, FL
Local No.  51, Richmond, VA
Local No.  52, Norfolk, VA
Local No.  55, Peoria, IL
Local No.  59, Harrisburg, PA
Local No.  62, Syracuse, NY
Local No.  63, Oklahoma City, OK
Local No.  71, Miami, FL
Local No.  74, Tampa, FL
Local No.  79, Little Rock, AR
Local No.  80, Greensboro, NC
Local No.  81, San Antonio, TX
Local No.  83, Tulsa, OK
Local No.  84, Reading-Scranton, PA
Local No.  85, Lansing, MI
Local No.  91, New Haven, CT
Local No.  93, Nashville, TN
Local No. 124, Mobile, AL
Local No. 126, Honolulu, HI

103

Local No. 131, Albuquerque, NM
Local No. 132, Madison, WI
Local No. 133, Austin, TX
Local No. 135, Charlotte, NC
Local No. 138, Poughkeepsie, NY
Local No. 139, Orlando, FL
Local No. 140, Phoenix-Tucson, AZ

# APPENDIX A

## Decisions of the
## Joint Industry Committee

The following decisions of the Joint Industry Committee were included as Appendix A to the Standard Agreement between NEII and the IUEC which expired on July 8, 2002. NEBA and the Union recognize these decisions as binding during the term of the present Agreement, except to the extent any of these decisions are in conflict with changes made to Article IV or Article IV (A) during negotiations for the present Agreement.

1.    **Wiring of Car Stations**

After due consideration of all the information that the Executive Board could gather, back as far as 1948, it was the decision of the Board that the Manufacturers be permitted to do the internal wiring in the car stations to a terminal block within the car station.

2.    **Pre-Drilled Overhead Beams**

Decision arrived at was that Otis would refrain from drilling holes on the bottom flange of the eye beam used to support the deflector sheave as soon as it was possible to stop the production line.

3.    **Pre-Wiring of Controllers**

On the protest registered over the pre-wiring of controllers, the employers agreed that the pre-wiring of

104

105

cross connections on controllers would be discontinued and in the future, auxiliary panels would go out without any leads for any wiring on them.

The employers further agreed that there would be no objection to a local removing the wiring, and replacing it, until the situation is corrected.

## 4.    Multi-Wire Cable

The ruling of the Board was that the use of multi wire cable has become prevalent throughout the Industry and they can find no objection to its use.

## 5.    Key Hole Slots

A review of past decisions and precedent established the fact that it had been previously agreed that key hole slots provided in car and/or landing doors are not a violation of Article IV of the Standard Agreement.

Also, it is found that it had previously been agreed that holes provided in the factory for mounting of interlocks, safety edges, detectors and photocells, are not a violation of Article IV of the Standard Agreement.

When Door Closer arms, lazy arms, or relating arms are fastened to the doors by means of drilled and/or tapped holes on the door such drilling and tapping shall be done in the field by Elevator Constructors. In cases where doors are delivered to the job site, pre-drilled or tapped for such devices as referred to in this paragraph, doors will not be installed until a satisfactory settlement between the employer and the Union is made.

## 6.    Escalators

It is agreed that the escalator truss or parts of truss maybe used as a shipping container for escalator components, such as tracks, sprockets, etc. Such components shall be secured within the truss with only sufficient fastenings to provide safe transit and shall not be permanently aligned.

It shall not be a requirement that tracks be removed from the truss prior to final alignment.

Connections between the straight inclined track system and the upper and lower end curved track systems shall be made in the field by Elevator Constructors.

Upper and lower sprockets or carriages are to be installed in the field by Elevator Constructors. See Article IV, Par. 2, Item C for additional information.

## 7.    Extended Wiring On Controllers

Controllers are not to be shipped from the factory with extended wiring attached thereto.

In the case of escalator controllers, because of limited space available, extended wiring in the form of cables or separate wires may be connected at one end to the controller in the factory provided, however, that the other end of such extended wiring is not prepared for connections.

**8      Plug-in Connections Door Protection**

Prepared plug-in connections for door protection devices such as furnished on the photobell protection device is not a violation of Article IV of the Standard Agreement.

**9.      DMR Plug-in Connection**

The plug connection presently being used on the DMR Regulating Unit will be discontinued. Factory installed wires leading out of the regulator shall have the loose ends unprepared for field connection by the Elevator Constructor.

It is agreed that the employer will use up present stock of regulators equipped with plugs. However, any regulators installed on new jobs after July 1, 1964, will be prepared as described in the above paragraph.

**10.      Car Door Operators**

Haughton Type 'T' and 'TH' and Westinghouse Type 'E' and other similar car door operators shall have the external wiring to the motor and the door or gate contact installed in the field by Elevator Constructors.

**11.      Wood Flooring**

When wood flooring on elevator platforms, including stage lifts, organ consoles and orchestra elevators, is to be installed in the field the work shall be done by Elevator Constructors.

108

**12.      Door Operators**

(1) The pattern for the Industry, for shipping door operators would be based on the practice in existence at the time of the Joint Industry Committee's decision of December 12, 1963.

(2) As a guide for present and future Joint Industry Committees, it was determined that the following Exhibits would be used to settle any future dispute relative to the shipping of door operators and would be construed as examples of the practice in existence in December 9-12, 1963.

Exhibit 'A' (Haughton 'T' Operator as per photo dated 12/13/67)

Operators may be shipped as per this Exhibit except all external wiring, all greenfield, all greenfield connectors and the gate switch shall be removed.

Exhibit 'B' (Haughton 'TH' Two-speed Operator as per photo dated 12/13/67)

Operators may be shipped as per this Exhibit except all external wiring, all greenfield, all greenfield connectors and the gate switch shall be removed.

Exhibit 'C' (Haughton 'TH' Center-opening Operator as per photo dated 12/13/67)

Operators may be shipped as per this Exhibit except all external wiring, all greenfield, all greenfield connectors and the gate switch shall be removed.

109

Exhibit 'D' (Westinghouse 'E' Line Operator as per photo 500581A, dated 12/13/67)

Operators may be shipped as per this Exhibit except all external wiring, all greenfield, all greenfield connectors and the magnetic locks shall be removed.

Exhibit 'E' (Dover Operator per photo dated 12/13/67)

Operators may be shipped as per this Exhibit except all external wiring, all greenfield, all greenfield connectors, the gate switch and the cams to actuate the safety edges shall be removed.

13. **Pre-Assembling of Machine to Machine Beams (Armor Elevator Co.)**

It was agreed by the Joint Industry Committee that the Armor Elevator Company is in violation of Article IV, Paragraph 2, sub-item "g" of the Standard Agreement by the method of pre-assembling the machine to the machine beams and the pre-drilling of the governor mounting plate.

14. **Holes Drilled in the Factory for the Mounting of Sight Guards**

shall not be considered a violation of Article IV of the Standard Agreement. The installation (and tapping if required), shall be done in the field by Elevator Constructors.

110

15. **Type M Hoistway Door Track Assembly (Haughton Elevator Company)**

It was mutually agreed that the spirator would be removed and that the pre-drilling and tapping was covered by Decision #1 of the Joint Industry Committee dated December 12, 1963.

16. **Pre-Fastening Booster or Blocking Beams to Machine Beams (General Elevator Company of Baltimore)**

The Joint Industry Committee finds that General Elevator of Baltimore method of pre-fastening booster or blocking beams, as established and shown on Exhibit 'A' entitled "Standard Machine Beam Detail with Booster Beam" dated May 7, 1968 is not a violation of Article IV.

17. **Dover Leveling Switches**

Dover Leveling Switches, as they are now constructed, are not a violation of the Standard Agreement.

18. **Westinghouse and Otis Basement Machines**

Westinghouse Basement Type #28 Geared Machine with deflector sheave attached as per DS Sheet 274D and Otis Basement Type 16BT machine with attached deflector sheave as per sheet 6588G are not in violation of Article IV of the Standard Agreement.

111

### 19. Top Emergency Exit Switches (Otis)

It was agreed that the switch could be removed in the field and remounted.

### 20. Otis Integral Hanger

That the primary function and responsibility of both the Union and the Industry is to assure a safe, reliable and workmanlike installation as regard door equipment. The employers agree that they cannot object to the dismantling of components if such becomes necessary to accomplish this.

(It continues:) There has been some question on interpretation of this clause, therefore, it has been agreed that the application of this decision requires that the mechanic-in-charge use his discretion with regard to removal of the hanger bar to accomplish the stated objective. Management supervisors should not be critical or attempt to penalize the mechanic for using such discretion but if he questions the decision, it should be adjusted between the Construction Manager and the Local Business Representative.

At the 1954 meeting of the International Executive Board and the Manufacturers' Labor Committee, it was mutually agreed that:

The Executive Board believes that when Article IV, Paragraph 8, that states "NO restrictions shall be imposed as to methods, tools, or equipment used" was written in the Standard Agreement, neither party, at the time, had in mind lethal tools, therefore; we believe

112

the members of the International Union have a perfect right to refuse to use explosive powered tools.

### 21. Cargo Masters 500 lbs. up to 1000 lbs.

All door assembly units must be removed before installation of car.

Pre-wiring of Cargo Master to be limited to door and ejector operation.

Ejector unit must be shipped separately.

The above conditions apply specifically to the Cargo Master with a capacity of 500 lbs. to 1000 lbs. as manufactured by Guilbert, Inc., and are not to be applied to the D/W provision of Article IV, Paragraph 3, Item 3, of the Standard Agreement.

### 22. Procedure For One Man Pressure Relief Valve Test

At a meeting of the National Arbitration Committee held on February 8, 1984, at the Sheraton Bal Harbour, Bal Harbour, Florida, it was jointly agreed that pressure relief valve test work may be performed by one mechanic so long as the following procedure is followed:

Item 1. The elevator must be equipped with a quick release coupling to which a pressure gauge could be connected.

Item 2. The Elevator Constructor mechanic is to be supplied with a temporary run button (the cable is

113

to be of a length which would permit the Elevator Constructor to position himself outside of the machine room or the hoistway while performing the test).

Item 3. With the elevator at the top floor, doors closed, shut off the main line disconnect.

Item 4. Disconnect one wire, which places the elevator on inspection, add one jumper on the directional limit, one jumper on the final limit, and connect the temporary run button to the appropriate terminals.

Item 5. Connect the pressure gauge to the quick release coupling.

Item 6. Put in the main line disconnect and position yourself outside of the machine room and/or hoistway and using the temporary run button, run the elevator up against the stop ring until you observe (hear) the bypass valve open.

Item 7. After checking the pressure gauge the mechanic is to open the bottom hoistway door and observe the cylinder and pipe for possible damage or leakage.

Item 8. If damage has occurred it will be repaired in the normal manner using a repair crew.

Item 9. The car will then be restored to normal service and observed as it runs the first few trips.

114

Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This is to confirm the understanding and agreement reached at the recent contract negotiations between NEBA and the Union.

It is understood and agreed that where a man has worked for more than one company and has worked at least 1750 hours entitles him to the minimum vacation pay guaranteed by Article XII. The obligation to pay minimum Vacation Pay shall be prorated between all the companies for whom the man worked based upon the hours the man worked for each company. The determination regarding a proration shall be made as of the end of the Vacation year December 31.

Very truly yours,
E. James Walker

AGREED:
Dana Brigham

115

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

At our recent contract negotiations the parties agreed that effective July 9, 2002 as part of the Company Management Training Program, the Company shall have the right to work up to twelve (12) salaried non-bargaining unit employees per year as Temporary Helpers for a total of three to eighteen months duration each with no more than one working per local per year; for which it shall pay $1800.00 per person to the local union and $180.00 per person to the International Union. The International shall be notified as to the names of the trainees and the location of their assignments.

Very truly yours,
E. James Walker

**AGREED:**
Dana Brigham

Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD  21046

Dear Mr. Brigham;

This is to confirm the understanding and agreement reached at the recent contract negotiations between NEBA and the Union, that the International Union of Elevator Constructors will hold the Company harmless in the event of administrative proceedings, arbitrations or litigations involving the applicability and/or enforcement of Article III, Par. 3.

Very truly yours,
E. James Walker

**AGREED:**
Dana Brigham

116

117

## MEMORANDUM OF AGREEMENT

This will confirm that during the negotiations for the collective bargaining agreement between NEBA and the IUEC to be effective July 9, 2007, the parties agreed to the following:

a) In the event that the Company experiences difficulties with employee response to emergency overtime call-backs in any local office, the Company shall inform the local union and the local union shall cooperate with the Company in establishing a call back system. In the event the Company and the local union cannot agree on the establishment of the call back system the Company and the IUEC shall establish a call back system.

b) Employees on contract service shall be required to carry and use beepers or any other designated communication devices that permit them to be contacted and informed of an emergency call while the employee is on the way to work at the beginning of the workday and while the employee is on the way home from work at the end of the workday.

**AGREED:**
Dana Brigham

**AGREED:**
E. James Walker

## TRADE SECRET AGREEMENT

During the term of my employment with the Company and thereafter, I will refrain from disclosing to other persons or entities, except with the Company's consent and for the Company's benefit during the course of such employment, any trade secrets or confidential information of the Company.

I will deliver to or leave with the Company all written and other materials containing The Company's trade secret, confidential, or proprietary information upon termination of my employment.

I acknowledge receipt of an executed copy of this agreement:

By:_____   _____
Employee signature        Print name

Date

By:_____
For the Company

118

119

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This will confirm the understanding reached during the recent contract negotiations concerning holidays that fall on Saturday or Sunday and that are celebrated on Friday or Monday, respectively.

The Union agrees that the Employer has an obligation to provide contract service to some of its customers on these Friday or Monday holidays. The Union further agrees that to provide such service it must require contract service employees to work on such days. It is agreed that the Employer shall have the right to schedule employees to work on such days in sufficient numbers needed to perform such work. The Employer agrees that it will make every effort to consider the desires of its employees when employees are scheduled to work such days.

Very truly yours,
E. James Walker

**AGREED:**
Dana Brigham

Dear Mr. Walker:

All new hires hired after July 8, 1997 will be classified as probationary Apprentices.

This is to confirm our understanding and agreement that any individual with an industry date prior to July 9, 1997, who is still a Helper as of the effective date of our new Agreement, will receive 70% of Mechanic's rate, plus fringe benefit and will remain at that rate until such time as he is qualified and meets the requirements as a fourth year Apprentice.

**AGREED:**
Dana Brigham

**AGREED:**
E. James Walker

120

121

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This letter will confirm the transfer policy between the primary and subprimary of the newly merged locals will be as follows:

a) Each merged local becomes a subprimary of the local with which it was merged.

b) The current employees form the permanent bench in each subprimary and primary.

c) The current expense Agreement in each affected local will remain in effect until replaced by a new expense Agreement negotiated between NEBA and the IUEC.

d) An employee sent from the primary to the subprimary, or vice versa, on a temporary basis will be paid expenses as required by his/her permanent base expense Agreement.

e) An employee who is transferred on a permanent basis from the primary to the subprimary, or vice versa, and this assignment does not require a household move shall receive four (4) weeks per diem from his/her old location expense Agreement, thereafter he/she is a permanent employee in the new location.

f) An employee who is transferred on a permanent basis from the primary to the subprimary, or vice versa, and does require a household move shall receive six (6) weeks per diem from his/her old location expense Agreement, thereafter he/she is a permanent employee in the new location.

g) When a person on the bench is hired in the primary and/or subprimary he/she shall be used in the new location by application of paragraphs (d), (e), or (f) above.

h) When an employee is permanently transferred as outlined in paragraphs (e) and (f) above, he/she is guaranteed a total of six (6) months employment in the new location or he/she will be paid per diem for the entire period less the per diem already paid.

This provision (h) does not apply if the employee is discharged for cause.

Very truly yours,
E. James Walker

**AGREED:**
Dana Brigham

122

123

## LETTER OF UNDERSTANDING

The parties agree that no Local Joint Apprentice-ship Committee may implement any rule that conflicts with any language of the Collective Bargaining Agreement.

Dana A. Brigham, General President, IUEC

E. James Walker, Jr., Executive Director, NEBA

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Dear Mr. Brigham:

This will confirm the understanding reached during our recent negotiations concerning local unions that may be merged or dissolved by the International Union of Elevator Constructors (IUEC) after January 1, 1992 and until the termination of the Agreement that will expire on July 8, 2012. NEBA agrees to meet and discuss the effects of such mergers on a local by local basis. Such discussions shall include but are not limited to hiring, expense agreements and open territory between the merged locals.

There shall be no change in any term or condition of employment under the Agreement or any local expense agreement until such time as the parties reach a mutual agreement as to such changes.

It is further agreed that such discussions are to begin as expeditiously as possible following the conclusion of negotiations for a new Agreement.

Very truly yours,
E. James Walker

AGREED:
Dana Brigham

124

125

## MERGED LOCALS

Due to the wage disparity created by merging the following locals, for the benefit of both the Employer and the IUEC, we will use the language in the letter confirming the transfer policy between the Primary and Sub-Primary of the newly merged locals contained in this Agreement. Using the increase schedule that we have provided, parity will be achieved for all of the merged locals within two (2) years.

| Receiving Local | Merged Local | Percentage of Parity | 1st Wage Increase | 2nd Wage Increase | 3rd Wage Increase | 4th Wage Increase | 5th Wage Increase |
|---|---|---|---|---|---|---|---|
| 93 | 64 | 96.60% | 98% | 100% | | | |

126

---

Mr. Dana Brigham, General President
International Union of Elevator Constructors
7154 Columbia Gateway Drive
Columbia, MD 21046

Re: Letter of Agreement

Dear Dana:

This memorandum details the agreement between the parties concerning potential conflicts between the Company's Alcohol and Drug Policy and those policies provided by customers as a precondition for securing contracts for the Company.

The Company will continue its practice of applying good faith efforts to apply its own policy. Should these efforts be unsuccessful and a customer insists on implementation of their own policy, the Company may institute such policies to the extent necessary to obtain the work.

Good faith efforts by the Company to avoid using the customer's policy will include:

1.  Advising the customer that the Company has agreed with the IUEC to a comprehensive company wide policy that addresses the maintenance of a safe and healthy work environment for its employees, and that it does not wish to apply any additional or different regulations.

2.  If written confirmation of the company's position fails to change the customer's position, the Company will attempt to obtain customer approval to as much of its policy as possible.

127

3. If the customer insists on the complete substitution of its policy for the Company's policy, the Company shall then seek volunteers to man said jobs.

4. The Company will not discipline, discharge or lay off employees solely due to their refusal to volunteer. However, such employees may be laid off if there is not sufficient other work to which they may be assigned.

5. The IUEC recognizes the importance of securing adequate volunteers and will cooperate in assisting in efforts to secure them.

This agreement shall remain in effect for one year unless extended in writing by the parties.

Very truly yours,
E. James Walker

**AGREED:**
Dana Brigham

128

## MEMORANDUM OF UNDERSTANDING

Except as otherwise agreed to by the parties, the terms of all agreements between the International Union of Elevator Constructors and/or its local Unions and the National Elevator Bargaining Association and its member Companies, including but not limited to local expense and local option agreements, that are in existence on the effective date of this Agreement shall continue in effect unless inconsistent with or superseded by this Agreement in which case the terms of this Agreement prevail.

**AGREED:**
Dana Brigham

**AGREED:**
E. James Walker

129

## SUBSTANCE ABUSE

**Par. 1.** In order to eliminate substance abuse in the workplace; to assist employees with substance abuse related illnesses, to have a safe workplace and efficient work-force. Such Substance Abuse Program shall be subject to the conditions set forth in this Article.

**Par. 2.** There shall be no random testing for drugs or alcohol for any reason other than stated in Paragraph 6. An employee who refuses to submit to random testing of any kind, for reasons other than stated in Paragraph 6, shall not be disciplined, nor shall that employee be refused access to the jobsite.

**Par. 3.** Testing may be performed on new-hire applicants for employment as a condition of employment prior to placing them on the payroll. The employer shall have the right to require a drug test for any referral for employment if such referral has not worked for that employer within the past 12 months.

Testing of referrals will be considered a part of the employer's pre-employment process. The referral will be employed while the employer is awaiting the return of the test results. If the test result is positive, subject to paragraph 5, the employer has no responsibility to that referral and may terminate the referral without consequence. However, said individual shall become eligible for employment in the industry at such time that the individual complies with a recognized rehabilitation or counseling program under this Substance Abuse Policy.

**Par. 4.** An employee may be tested when probable cause exists to believe that the employee is impaired on the job. Probable cause will be deemed to exist under the following circumstances:

(a)   The employee's conduct or actions indicating alleged impairment shall be observed by one supervisor on the jobsite and confirmed by a second supervisor whenever possible. The supervisor(s) shall record their observations in writing stating the date, time, length of observation, jobsite and actions of the employee which they believe constitute drug or alcohol impairment. Such statements shall be signed; and

(b)   A determination is made that the employee's conduct is symptomatic of alcohol or drug impairment by an independent physician or health care professional qualified to make such a determination, following a consultation with the employee. The physician or health care professional shall be of the Employer's choosing and the cost of

130

131

such consultation and determination shall be borne by the Employer if it is not covered by applicable insurance; or

(c)   Any employee involved in an accident which results in professional medical treatment or damage to company property will be required to submit to a test for the presence of alcohol or drugs. This requirement will be waived when the injury or accident was solely the result of a third party's action, or where it can be determined that drugs or alcohol were not a contributing factor.

**Par. 5.** An employee who is properly requested to undergo testing in accordance with the minimum procedures set forth in paragraph 4 above shall be tested within 24 hours. If the employee refuses, the employee is subject to disciplinary action up to and including termination and the employee shall be deemed unqualified and barred from work within the industry until such time the employee successfully complies with a recognized rehabilitation or counseling program under paragraph 6 of this section.

The Company must use a recognized and reputable concern for testing, with sufficient facilities and quality control features to ensure accuracy in test diagnosis and the capability to

132

store samples. Chain of custody procedures must be observed at all times. The Company will comply with any state laws concerning drug testing.

The results of the test of an employee who tests positive the first time must be confirmed by SAMHSA standards. For a positive, adulterated or substituted result reported on a single specimen or a primary specimen, the employee may request through the MRO that the same specimen (or split specimen) be tested by a second authorized (SAMHSA certified) laboratory. The employee has 72 hours (from the time the MRO notified the employee that the specimen was reported positive, adulterated or substituted to request a retest of the same specimen (or split specimen). If the independent retest indicates a negative result, the Employer may elect to retest the employee's initial sample. If the results are again negative, the employee will be put back to work immediately (if he is off work) and made whole for any loss of pay occasioned by the first positive test results.

**Par. 6.** An employee whose final test results are positive (and who has not tested positive previously) will be referred to the Company's Medical Review Officer, (see attachment) Employee Assistance Program or some other recognized and approved rehabilitation or coun-

133

seling program. The cost of such programs may be offset by appropriate insurance coverage. If the employee enters such a program, his status as an employee will not be affected, except as provided for in paragraph 3 above, and he will be allowed access to the job under the conditions established by the program. An employee who refuses a proper request to enter, participate in and successfully comply with such a program shall be deemed unqualified and barred from returning to work within the industry. Employees may be disciplined, up to and including discharge, for subsequent positive test results. Employees who test positive two (2) times, and have been discharged by the Employer, shall be deemed unqualified and shall not return to work within the industry until he/she has successfully complied with a substance abuse program. Said individual, upon returning to work, may be randomly tested for substance abuse for a period of one year at the Employer's expense.

**Par. 7.** Testing may be for drug or alcohol impairment only and not for any other medical conditions. Neither the Company nor any medical or testing personnel, shall disclose any information regarding the fact of testing or the results of testing to any other employer or customer. All test results and related information will be given the same confidentiality as any other medical information in the Company.

134

**Par. 8.** Any employee(s) who possesses, sells, transports or distributes illegal drugs or unauthorized alcohol at a work site, on the company premises, or on company time is subject to immediate discharge.

This statement of principles shall apply to all employees represented by the International Union of Elevator Constructors. Substance abuse testing and treatment measures are appropriate for all employer non-bargaining unit employees as well, including company executives and officers.

135

## RIGHTS OF EMPLOYEES

a)  Before requesting an employee to undergo drug or alcohol testing, the employer shall provide the employee with a form on which to acknowledge that the employee has seen the drug and alcohol testing policy.

b)  If an employee tests positive for drug or alcohol use, the employee must be given written notice of the right to explain the positive test and indicate any over-the-counter or prescription medication that the employee is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test.

c)  Within three (3) working days after notice of a positive initial test result the employee may submit information to the employer, in addition to any information already submitted under paragraph (b), to explain that result.

d)  An employee who tests positive will have 72 hours following the date which the employee is notified of the test result to advise the company, in writing, of the employee's desire to request a retest of the original sample at the employee's own expense.

136

e)  Unless a positive test result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

f)  The employer will bear the costs of all testing except for retests requested by employees after an initial positive test result.

g)  Anytime an employee submits to a drug test under the Substance Abuse Program of this Agreement at the request of an employer, a copy of a positive test result shall be confidentially delivered to the employee no later than the end of the next business day after receipt of the test results by the employer.

Refusal to test or provide an adequate sample when required by this policy shall constitute insubordination and is a violation of this Agreement.

Any specimen altered by the employee will be considered a positive test result and therefore a violation of this policy. Any specimen altered by the employer will be considered a negative test result.

## MEDICAL REVIEW OFFICER

The Company will appoint a Medical Review Officer (MRO) to administer this Policy. The responsibilities of the MRO shall be to:

137

a)   Select and utilize services of a testing laboratory that meets one of the criteria for drug testing established by [Bargainers in local areas will have to decide whether to use U.S. Department of Health and Human Services standards or other state or local law standards for all elements of the program including approved MROs for testing of specimens collected under this Policy.]

b)   Provide specimen test kits and collection locations that follow chain of custody collection techniques mandated by [adopted standard].

c)   Maintain appropriate systems, records, and administrative procedures to provide participating employers with accurate and timely information as to the drug and alcohol free status of employees.

d)   Ensure that the testing facility conducts both an initial drug screen and a confirmation test on specimens before reporting positive results.

e)   Notify the tested individual of a positive result and provide the individual with an opportunity to explain the reasons why their test might be positive.

f)   Review and verify a confirmed positive test result and process the donor's request for a confirmatory retest of the original sample.

g)   Review a participating employee's medical record if so requested by the employee.

h)   Notify the employer's contact person of all test results, both positive and negative, if required.

i)   Refer individuals testing positive to the appropriate medical evaluation and participate in return to duty decisions as set forth in this Policy.

j)   Ensure the drug and alcohol policy and program complies with [Federal, State, and local law].

138

139

## LETTER OF UNDERSTANDING

In the event any State or the Federal government requires an exam for the fourth-year apprentices, the parties agree that such fourth-year exam shall not be considered a requirement under Article X, Para. 6.

Dana A. Brigham, General President

James Walker, Executive Director

140

LETTER OF AGREEMENT
Mechanics Employed as Assistant Mechanic

In consideration of the uncertainty of the current economic conditions and in anticipation of potential instability in employment levels, NBBA and the IUEC agree to the following temporary measures effective August 1, 2010.

1.   There shall be a classification to be known as "Assistant Mechanic" and that Mechanics may be employed as Assistant Mechanic subject to Article XXII and to the following:

   a.   The wage rate for Assistant Mechanic shall be 80% of the wage rate for Mechanics in the local union where s/he works and the job assignment will be identical to that of a fourth year apprentice;

   b.   The Mechanic, the Mechanic's Business Representative and the Employer signify their agreement to employ an Assistant Mechanic by executing the document attached hereto and identified as "Attachment A". No other agreement is required nor shall any other agreement be recognized by the Parties; and

   c.   When electing Assistant Mechanic status, the Mechanic agrees that s/he shall not be eligible to work as a Mechanic for a twelve-month period. The Agreement may again be renewed at the end of the twelve-month period. An Assistant Mechanic can be elevated to mechanic status during that 12 month period should his/her employer offer the Assistant Mechanic a permanent mechanic's position. If the Assistant Mechanic chooses to accept such position, the signed Assistant Mechanic agreement will be rendered void and should the mechanic become unemployed he/she cannot enter into another agreement until the 12 month time period of their Assistant Mechanic agreement expires.

   d.   An Assistant Mechanic can become a temporary mechanic should his/her current employer choose to employ the Assistant Mechanic as a Mechanic for a period not to exceed any ninety (90) day period at the appropriate Mechanic's wage rate. Should an assignment as Mechanic exceed ninety (90) days, then the Mechanic shall not be eligible to return to Assistant Mechanic status and Attachment A shall be considered void. An Assistant Mechanic can only be considered for a Temporary Mechanic position provided there are no available Mechanics on the Local's out of work list. Assistant Mechanics and Fourth Year Apprentices shall be equal in terms of selecting Temporary Mechanics.

2.  For purposes of hiring, it is agreed that the current language in Article XXII, Par. 1(a)(3) shall be superseded by the following:

    a.  When hiring an experienced Apprentice, Helper and/or Assistant Mechanic from the local open employment list, the Company will first hire those classified as fourth year Apprentices whose names appear on the open employment list. Thereafter, the Company may select and hire or reemploy any Apprentice, Helper or Assistant Mechanic. However, at its sole discretion, the Company may select and rehire or reemploy any Apprentice, Helper or Assistant Mechanic who has previously worked for the Company during the immediately preceding twelve month period, irrespective of the availability of any fourth year Apprentice.

3.  For purposes of layoff, it is agreed that the current language in Article XXII, Par. 3 shall be superseded by the following:

    a.  When an Employer makes layoffs, the Probationary Apprentice will be laid off first, thereafter any transient Helper, then any transient Apprentice, then any transient Assistant Mechanic, then any 1st year Apprentice, followed by any Helper who permanently lives in the area and/or any 2nd and/or any 3rd year Apprentice and/or any 4th year and/or any Assistant Mechanic (these 5 classifications shall be combined to be a single classification/pool for the purposes of layoff) at the Employer's sole discretion. The Employer will determine the order of layoff in each classification. Employees laid off shall be paid at the next weekly payroll period following the layoff.

    The Temporary Mechanic shall be set back in the same order as mentioned in Article X, Par. 4 prior to layoff of a transient Mechanic, not including temporary transfers referred to in Article XXII, Par. 4, and lastly, those Mechanics who permanently live in the area will be laid off.

4.  Article XXII, Par.1 (b) shall include Assistant Mechanic as experienced workman seeking employment. Applicants seeking employment as Assistant Mechanics shall be identified as such on any referral list.

5.  It is agreed that the first sentence of Article XXII Par. 1(b) shall be amended to read: "The Company shall hire experienced Mechanics, Helpers, Apprentices and Assistant mechanics who permanently live in the area, are seeking employment and are qualified to perform the work required by the Company before hiring a transient employee or a new inexperienced employee."

This agreement and all terms and conditions related thereto automatically terminate on July 8, 2012, but can be renewed by mutual agreement in writing. Implementation of this agreement and terms and conditions related thereto cannot be introduced or considered in any proceeding except one to enforce this agreement.

For NUB:

For HBC:

Date: 8/1/2010

Date: 8-1-2010

## ATTACHMENT "A"

### Assistant Mechanic Agreement

I agree to accept Assistant Mechanic status for twelve (12) months from the date of this agreement. The terms and conditions of employment as an Assistant Mechanic have been agreed upon by the IUEC and my employer and are contained in the Letter of Agreement relating to Assistant Mechanics included in the amended collective bargaining agreement.

I understand that the wage rate for Assistant Mechanic shall be 80% of the wage rate for Mechanics in the local union where I am working.

It is understood that by signing this Agreement, there is no guarantee of employment.

Should the terms of the Letter of Agreement for Assistant Mechanics be violated, this agreement will immediately become null and void.

Print Name: _____

Signed: _____

Date: _____

Company: _____

Signed: _____

Date: _____

Local Union: _____

Business Representative: _____

Date: _____

Letter of Understanding

1.  As a result of the Letter Agreement creating an Assistant Mechanic position, Article X, Par. 4 of the NEBA – IUEC collective bargaining agreement dated July 9, 2007 is modified effective August 1, 2010, to delete the following sentence: "An Apprentice who has successfully passed a Mechanic's Examination shall become a Mechanic no later that eleven (11) months after the date of the examination."

For the IUEC                                      Date   8-1-2010

For NEBA                                          Date   8/1-2010

# Exhibit B

# IUEC GRIEVANCE FORM

Grievance No.: 4 - 21

Employer: Otis

Date Filed: 2/14/2008

**WRITTEN STEP ONE (To Be Completed By Grievant)**

Name: Otis Elevator

Address: 50 Park St
Dorchester, MA 02122

Local Union No.: 4    Telephone No.: 617-288-1547

Check One:    ___ IUEC    _X_ Local    ___ Employee    ___ Employer

Company Representative & Date Of Oral Step Dispostion: Dick Houge 2/12/2008

Statement Of Grievance: Otis Elevator assigning work to the General contractor having them build a temporary platform at the top of hoistway for members to work off IUEC members have historically built there own staging and work platforms for the installation of elevators.

Agreement Provision(s) Violated (if known): Art. IV Para. 2

Remedy Requested: Otis stop assigning work to others that has always been done by IUEC members. Otis Elevator pay 4 team hours for the 9 platforms Dick Houge had the general contractor build. 5 at Portland Maine medical center 4 in Bangor at the Hollywood slots job site. 36 team hours @ 122.73 p/h = 4418.28

'To be completed by employer or local union against whom grievance was filed)

.received By: _____    Date Received: _____

Written Step Meeting Held On (date): _____

Disposition Written Step One: Otis asked for a week to review. At the end of almost 3 weeks, they denied the grievance

_____ Employer Representative    3/26/2008 Date

[ ] accepted    [X] appealed

_____ Regional Director, IUEC (or designee)    4/18/2008 Date

**Written Step Two (National Arbitration Committee)**

Disposition Written Step Two: _____

_____ Employer Representative    _____ Date

[ ] accepted    [X] appealed

_____ IUEC Representative    _____ Date

# Exhibit C

# IUEC GRIEVANCE FORM

Grievance No.: 6 - 7

Employer: Otis

Date Filed: 6/20/2008

**WRITTEN STEP ONE (To Be Completed By Grievant)**

Name: Michael Garfold

Address: 2945 Banksville Rd.
Pittsburgh, PA 15216

Local Union No.: 6    Telephone No.: 412-341-6666

Check One:   __ IUEC        _X_ Local        __ Employee        __ Employer

Company Representative & Date Of Oral Step Dispostion: Nick Virgilio 6/20/2008

Statement Of Grievance: Otis used the General Contractor to install three (3) work platforms for the mounting & aligning & adjusting the Gen II hoist-motor-governor assembly. This work has always been done by IUEC members.

Agreement Provision(s) Violated (if known): Art. IV Para. 2

Remedy Requested: Otis to pay the amount of $4,244.80 to the General Fund of Local #6.

(To be completed by employer or local union against whom grievance was filed)

Received By: _____   Date Received: _____

Written Step Meeting Held On (date): _____

Disposition Written Step One: _____

[ ] accepted    [ ] appealed

_____  _____
Employer Representative        Date

_____  _____
Regional Director, IUEC (or designee)   Date

**Written Step Two (National Arbitration Committee)**

Disposition Written Step Two: _____

[ ] accepted    [ ] appealed

_____  _____
Employer Representative        Date

_____  _____
IUEC Representative           Date

Please mail copies with signatures to IUEC Headquarters, Regional Director, Local Union and Employer/ECA

# Exhibit D



Grievance No.: 27 - 1

# IUEC GRIEVANCE FORM

Employer: Otis

Date Filed: 3/18/2008

**WRITTEN STEP ONE (To Be Completed By Grievant)**

Name: Alan Rothfuss Jr    Address: 244 Paul Rd. Suite 3
Rochester, NY 14624

Local Union No.: 27    Telephone No.: 585-436-6440

Check One:  ___ IUEC    _X_ Local    ___ Employee    ___ Employer

Company Representative & Date Of Oral Step Dispostion: Tim Reidy 3/18/2008

Statement Of Grievance: The Otis Gen II work platform used to perform the mounting, aligning, and adjusting of the postion of the hoist-motor-governor assembly was not installed by a team of Otis Field Mechanics, Helpers, or Apprentices. This work has always been done by IUEC members.

Agreement Provision(s) Violated (if known): Art. IV Para. 2

Remedy Requested: As 2 Mechanic's are installing the job, Local 27 requests that 3 days of team Mechanic's Wages and Fringes be paid and they are $37.945x2x24 = $1,821.36 plus $16.065x2x24 = $790.32 plus $1,821.36x.08x2 = $145.71 for a total of $2,757.49 made payable to Local 27. Otis will no longer assign the work of the IUEC to anyone other than IUEC members.

(To be completed by employer or local union against whom grievance was filed)

Received By: _____    Date Received: _____

Written Step Meeting Held On (date): _____

Disposition Written Step One: _____

_____
_____
_____
_____
_____

_____    _____
Employer Representative    Date

[ ] accepted    [ ] appealed

_____    _____
Regional Director, IUEC (or designee)    Date

**Written Step Two (National Arbitration Committee)**

Disposition Written Step Two: _____

_____
_____
_____
_____

_____    _____
Employer Representative    Date

[ ] accepted    [ ] appealed

_____    _____
IUEC Representative    Date

# Exhibit E

( )

○

# IUEC GRIEVANCE FORM

Grievance No.: 62 - 5

Employer: Otis

Date Filed: 5/23/2008

**WRITTEN STEP ONE (To Be Completed By Grievant)**

Name: Robert Kimmerle                    Address: 615 W. Genesee St.

Local Union No.: 62    Telephone No.: 315-422-5219    Syracuse, NY 13029

Check One:    ___ IUEC          _X_ Local          ___ Employee          ___ Employer

Company Representative & Date Of Oral Step Dispostion: Christian Praszkowlcz 5/22/2008

Statement Of Grievance: The Otis Gen II work platform used to perform the mounting, aligning, and adjusting of the position of the hoist-motor-governor assembly was not installed by a team of Otis Field Mechanics, Helpers, or Apprentices. This work has always been done by IUEC members.

Agreement Provision(s) Violated (if known): Art. IV Para. 2

Remedy Requested: 36 hrs. at mechanic's rate ($35.93 per hr.) plus 36 hrs. of benefits ($16.50 per hr.) and 36 hrs. at 3rd year apprentice rate ($25.15 per hr.) plus 36 hrs. of benefits ($16.50 per hr.) to be paid to Local 62 Contingency Fund.

**(To be completed by employer or local union against whom grievance was filed)**

Received By: _____    Date Received: _____

Written Step Meeting Held On (date): _____

Disposition Written Step One: Otis denies the grievance.

[ ] accepted     [X] appealed

_____    6/4/2008
Employer Representative        Date

_____Michael J. Langer_____    6/4/2008
Regional Director, IUEC (or designee)    Date

**Written Step Two (National Arbitration Committee)**

Disposition Written Step Two: _____

[ ] accepted     [X] appealed

_____    _____
Employer Representative        Date

_____    _____
IUEC Representative        Date

Please mail copies with signatures to IUEC Headquarters, Regional Director, Local Union and Employer/ECA

# Exhibit F

| | |
|---|---|
| OTIS ELEVATOR CORPORATION<br>BOSTON, MA<br>AND<br>INTERNATIONAL UNION<br>ELEVATOR WORKERS<br>AFL-CIO | * ARBITRATION OPINION AND DECISION<br>* FMCS CASE NO. 00-13775<br>* CONSTRUCTION INSTALLATION DISPUTE<br>* ARNOLD M. ZACK, ARBITRATOR<br>* DATE OF DECISION: 3/20/01<br>* |

On January 3, 2001, I held hearing in Boston, MA, to arbitrate the following dispute. Robert Matisoff, Esq., represented the Union. Peter B. Robb, Esq., represented the Company. A transcript was taken of the proceedings and I received post-hearing briefs on February 20, 2001.

## THE ISSUE

The parties agreed upon the issue to be decided as follows:

> "What shall be the disposition of the dispute cited in the September 25, 2000 letter from Joe Byrka to Dana Brigham?"

## THE FACTS

For many years prior to the 1980's, bargaining unit personnel were responsible for attaching the vertical rails on which elevators rode, to the building structures to stabilize the vertical movement of the elevators. Bargaining unit members attached brackets to the building structure, which also often supported the building's floors as well.

In the late 1980's, the Company began to require general contractors to construct walls, generally of sheet rock at the elevator wall line. According to the testimony in 40% to 60% of the constructions, this required the attachment of extensions from the building structure to the elevator hoist wall where elevator brackets were to be attached by bargaining unit members. In approximately half of these cases, the building general contractor using his own personnel attached the extensions. In the other half of the cases, Otis was asked to attach the extensions, which were then installed by the bargaining unit personnel.

The present dispute arose at the Brighton Landing construction site where the Union challenged the Company's permitting the building's general contractor to install the extensions by people other than the Otis bargaining unit personnel.

1

The Union and Company agreed to arbitrate the dispute as to whether or not the welding of extensions is IUEC work.

In a letter to Dana Brigham dated September 25, 2000, Joseph Byrka, Director of Labor Relations, wrote in part

> In the recent past the IUEC and Otis have had many discussions regarding "extension brackets" as defined by the Brighton Landing project in Local 4's jurisdiction. This disagreement is whether or not the welding of these "extensions" is IUEC work or work of the contractor. The parties agreed for Otis to pay ½ hour per bracket on the Brighton Landing job and to arbitrate the issue. That arbitration is pending waiting dates from the arbitrator. Additionally, it was agreed the monies paid in the above noted instance would be returned to Otis should Otis prevail in the arbitrator's decision.

The pertinent provisions of the parties' agreement read as follows:

Article IV Work Jurisdiction

Par. 2
(b)    The erecting and assembling of all elevator equipment to wit: electric, hydraulic, steam, belt, dumbwaiters, residence elevators, parking garage elevators (such as Bowser, Pigeon Hole, or similar types of electors), shuttles, compressed air and hand-power.

(f)    The installation of all grating under the control of the Company. The installation of all counterweight screens, overhead work, either wood or iron, and all material used for mounting of elevator apparatus in machine room, overhead or below.

Par. 4
(a)    It is agreed that when sinking, drilling, boring or digging cylinder wells for hydraulic lifts, hydraulic elevators or screw lifts, the Company shall employ Elevator Constructor Mechanics and Elevator Constructor Helpers.

Par. 8
Inserts and/or bond blocks are to be set by Elevator Constructor Mechanics in the primary jurisdictions of local unions at the option of the Company. Inserts may be set by others outside of the primary jurisdictions of local unions where a full day's work cannot be provided.

2

## POSITION OF THE UNION

The Union contends that Article IV guarantees to Elevator Contractors in the employ of the Company the erecting of all grade rails and the installation of "all material used for mounting elevator apparatus in machine room, overhead or below".

It recognizes that there are certain situations listed in Article IV, Par. 3, where work can be done on a prefabricated basis, and in Par. 4, involving hydraulic elevators, and in Par. 5, involving hoisting of materials, and also in Par 7 and 8. It contends that other arbitrators have concluded that Article IV protects the Union members against being deprived of bargaining unit work by an employer unless the union has expressed its consent.

Here, the Union asserts, the Company has urged building owners and their general contractors to perform work that is traditional bargaining unit work. It insists that the installation of both rails and brackets is bargaining unit work since they are used to mount elevator apparatus below the overhead machine room, and that the Company itself acknowledged in its opening statement that installation of brackets is Article IV work. Additionally, the Company has conceded that Elevator Constructors have installed bracket extensions, and it asserts that bargaining unit employees should install bracket extensions extending into the hoistway, extending from the structural steel or wall to the edge of the elevator hoistway, as well. Bracket extensions into the hoistway, as well as those to the edge of the hoistway are installed only for the purpose of attaching rails and are not a part of the steel beam structure holding up the building. Both use the same materials and installation method and is necessary to erecting and mounting guide rails, bargaining work specified in Article IV, Par. 2(e) and (f). Both consist of welded steel angles, both are subject to the same forces and for both information on load and force must be calculated by Otis and transmitted to the owners' structural engineer.

The Union asserts that the Company's decision to adopt the Flexible Installation Technology System can not be permitted to block employees from doing work reserved to the bargaining unit, that openings can be cut in the sheet rock to allow employees to affix brackets, or they could be affixed before the sheet rock is mounted. It points to the Union witnesses who testified consistently that Elevator constructors have long and exclusively installed bracket extensions until the new system was introduced, and to the fact that Company witnesses provided contradictory testimony as to the past practice and extent to which bargaining unit employees still do this work. It cites the only instance where

3

extensions were done by others at Brighton Landing, noting that the Company failed to meet the Union's request for other jobs where brackets were installed by others. It therefore urges I draw the inference from the Company's failure to produce evidence to the contrary that there is simply no documentary evidence to support the Company's assertion that general contractors have routinely installed bracket extensions over the past ten years.

Even if the new system has advantages, the Union continues, the Company does not have the right to violate Article IV because of such advantages. It cites Article II, Par. 2, as holding that the initiation of new developments does not diminish the right of the employees to the work jurisdiction specified in Article IV, and notes that there is no restriction under Article IV to the limits or confines of the hoistway. It notes that under the standard agreement in effect until 1987, inside the primary jurisdiction of the local inserts were to be set by Elevator Constructors, and that the Company failed to achieve language in its own agreement which would have removed inserts from the Union's jurisdiction.

The Union emphasizes that historically when the Company sought to have work done by others than its own employees, it negotiated exceptions to the protected jurisdiction.

The Union concludes that the installation of bracket extensions like the installation of the brackets themselves is part of the process of erecting guide rails, work expressly granted to the bargaining unit, and that the Company should not be allowed to evade that jurisdiction by stating that the work is now the responsibility of owners or general contractors. It urges that the grievance be sustained, that the Company be directed to cease such conduct in its bids and contracts, that the disputed work be assigned to Elevator Constructors, and that those affected be made whole for lost earnings.

---

## POSITION OF THE COMPANY

The Company contends that it can not be held responsible for assignment of work that it does not control, that the general contractor, O'Conner-Dimeo, retained control over the design and material of the support for elevator rails and rail rackets, that the supports are of varying types installed by non-Otis employees, and that Otis does not employ structural engineers who could determine appropriate structural support.

The Company further contends that it is not obligated to force a general contractor to assign work to Otis employees and that there is no contract provision so providing. It notes that elevator constructors under Article IV have jurisdiction over work assigned by Otis, and that there is nothing in that language which mentions general contractors or even encourages Otis to seek assignment of any particular work. It asserts that attachment of

extensions to I-beams have always been under the control of general contractors, and that Otis' authority to subcontract work presumes that Otis has control of the work assignment and that Otis decides to contract the work out. Otis asserts that accordingly, it has used bargaining unit Elevator Contractors to weld extensions to I-beams when and if Otis had been given that work by the general contractor.

The Company points out that Otis subcontractors with the general contractor have not excluded the installation of rail bracket extensions by Otis employees, but have shifted responsibility for providing adequate structural support for the rail brackets on the general contractor. There has been no effort by Otis to ask the contractor to require contractors to install all extensions, and when asked by the contractor, Otis attaches extensions using elevator constructors.

The Company asserts that there is no past practice of Elevator Constructors installing all supports for rail brackets, that most elevators are installed by attaching rail brackets to supports other than the so-called extensions. According to the Company, the practice has been to use employees other than Elevator Constructors to weld extensions to I-beams, and that that practice has continued during three Otis-IUEC contracts. It estimates that workers other than Elevator Constructors install the rail racket extensions about 80% of the time before Otis began work at the job site, with Otis being selected to attach the extensions to the I-beams in about half the remaining situations. It notes that none of the Union witnesses testified as to who installs rail bracket extensions where Otis is on the job and that none of the 150 Elevator Constructors currently employed by Otis was called to testify as to current practice. It noted that in the 1400 to 2100 elevators installed by Otis in the Boston area over the last seven years, the Union was able to uncover only one job where Elevator Constructors welded rail bracket extensions to I-beams, which the Company notes is conclusive evidence that the work does not belong to IUEC. In the 1994 Dover Elevator Company case cited by the Union, the Company notes that the contractor had control over whether the extensions would be used and who would fasten them, and there the Union abandoned its grievance, abandoning all hope of establishing a past practice.

Accordingly, the Company urges the grievance be denied.

---

**DISCUSSION**

There is no question that Article IV reserves to the bargaining unit elevator constructor mechanics and elevator constructor helpers the work associated with erecting and assembling elevator equipment. Nor, is there any question that that jurisdiction

includes the "erecting of all guide rails" as well as the Installation of all materials used for mounting elevator apparatus in machine room, overhead or below". Despite the strength of the protections afforded to bargaining unit employees in the erecting and assembling of elevator equipment, it must follow that the work they are to perform is dependent on contractors building the structure into which the elevator is to be installed. While the building owners or contractors will presumably design and construct the building with the expectation that the Otis Company and its employees will be responsible for erecting and assembling all elevator equipment, neither Otis nor its employees have any inherent right to determine how the structure is to be built or how close to the proposed elevator way the structural components of the building will be placed. It is only when the building owners or contractors agree with Otis to have the employee in this dispute erect and install the elevator that Otis has any jurisdiction over the elevator installation and it is only when Otis has secured the authority to erect and install the elevator that its employees have the ·jurisdiction to assert the contractual right to perform the work under that installation agreement.

If the builder contracts with Otis to build the elevator making the necessary connections and installations from the structural mainframe of the building up to and including the elevator installation, then Otis would have the authority to do so, and the responsibility to live up to the work assignments negotiated in this collective bargaining agreement with the Union. But, if the builder contracts with Otis to confine its connection and installation work to be within the more immediate area where the elevator is to be placed, such as the hoistway, then Otis is limited to that contracted work and its bargaining unit employees are still entitled to exercise their jurisdictional authority for that work which Otis has achieved the contractual right to perform. It is within the authority of the builder to determine the scope of its contract with Otis. The bargaining units access to work can only flow therefrom based upon its negotiated agreement with Otis for the work Otis was contracted to perform.

It therefore follows that the installation of brackets is bargaining unit work if Otis was contracted to install the connection between the structure and the area where it traditionally contracts to install the rails and brackets that are a part of its usual elevator erection and installation. It also follows that if the building owner or contractor opt to bring the building structures and the connections thereto up to the face wall of the hoistway or hoist shaft, and contract with Otis to do other work within that immediate hoist shaft that is within its authority, even though it might restrict the work expectations of bargaining unit employees or indeed Otis as well.

6

The Union asserted that until recently no one other than elevator constructors installed bracket extensions whenever necessary to connect to the building structure. Management witnesses stated that employees other than bargaining unit elevator constructors installed the extensions about 80% of the time before Otis even began to work at the job site. Although Union witnesses testified to installation of brackets and extensions adjacent to or within the hoistway, none of the bargaining unit personnel whom the Union claimed were called to testify on that exclusivity when the bracket extensions existed outside the hoistway. The Company on the other hand in response to a request for total U.S. records, apparently provided the Union with a list of some 20 jobs in the Boston area where the extensions were installed by other than bargaining unit personnel.

Although the Company some ten years ago introduced a new system of sheet work installation at the hoistway, and although that new prerequisite has highlighted the focus of extensions at or just beyond the hoistway walls, the evidence is persuasive that even before the sheet rock change, it was the province of the contractor to determine whether Otis or the building contractor would bring the structure or its connectors to the hoistway for Otis to make the requisite connections for the elevator installation.

Although Otis may have requested and expected general contractors to assume responsibility of installing extensions, there is no persuasive evidence that it undertook to do so to keep that work from bargaining unit personnel. Indeed the evidence shows that the contractors were given the option of having Otis install those extensions if it so preferred.

In the light of the foregoing, I must conclude that the Employer did not violate the parties' agreement when it confined the extension bracket installation work to that done within or at the hoistway wall when the contractors opted to have extension work beyond that sheet rock hoistway wall done by non-bargaining unit employees.

---

## DECISION

The grievance cited in the September 25, 2000 letter
from Joseph Byrka, Company Director of Labor
Relations, to Dana Brigham, IUEC General President,
must be denied.

_____
Arnold M. Zack

7

Case 1:12-cv-00159-RJA    Document 1    Filed 02/21/12    Page 117 of 125

# Exhibit G



**Schindler Elevator Corporation**

February 17, 2012

*Via Facsimile and U.S. Mail*

Mr. Donald M. Winkle, Jr.
International Union of Elevator Constructors
Local Union No. 14
3527 Harlem Road, Suite 9
Buffalo, NY  14225

Dear Mr. Winkle:

The purpose of this letter is to demand that IUEC Local 14 immediately cease the improper activities in which it is currently engaged.  Local 14's activities are illegal and in violation of Article XIV, the no-strike clause, in the collective-bargaining agreement between the National Elevator Bargaining Association ("NEBA"), on behalf of Schindler Elevator Corp. ("Schindler"), and the International Union of Elevator Constructors ("IUEC"), on behalf of Local Union No. 14 ("Local 14") (the "NEBA Agreement").

As Local 14 is well aware, Schindler is scheduled to begin work on a construction project, with very tight deadlines for completion, at 134 High Street MMTS in Buffalo on Monday, February 20, 2012.  Indeed, Superintendent Reitano and I contacted you on or about February 1, 2012 to discuss the project with you and to advise you that Schindler employees will be using scaffolding and a temporary working platform erected by the General Contractor during the early stages of construction.  Your initial reaction was to claim that erection of scaffolding and the temporary working platform was to be done exclusively by IUEC members, and that erection by anyone else violated the NEBA Agreement.  Later, you claimed that the scaffolding and platform were not safe.  To address any possible safety issues, we provided you with a letter from a certified scaffolding inspector verifying that the scaffolding complied with Occupational Safety and Health Administration ("OSHA") Standards for Scaffolding.  You also visited the jobsite and inspected the scaffolding and platform without expressing any concern about safety.  In fact, your only concern at that time was the Local 14 has "several guys on the bench."  During your visit, you asked whether Schindler would deem our prior discussions regarding the scaffolding and platform as the first step of the grievance process, and I agreed to do so.

Despite the OSHA certification and your own inspection during which you expressed no concerns about safety, and the pending grievance, we learned from employees and from a third party that you are directing Schindler employees to refuse to work off the scaffolding and platform erected by the General Contractor at 134 High Street.  You admitted this directive during a telephone conversation with me on Friday, February 17, 2012 claiming that your directive is not a breach of the no-strike clause because "it's a safety issue."  We both know there is no safety issue, and your directive to Schindler employees is unlawful and in violation of the NEBA Agreement.

80 Curtwright Drive, Suite 3          Tel:  (716) 632-1463
Williamsville, NY  14221-7055      Fax: (716) 632-1466
                                                  www.us.schindler.com



You have alleged that the erection of scaffolding and a temporary working platform by the General Contractor at the 134 High Street job violates Article IV of the NEBA Agreement. Article IV not only defines the work that is to be performed exclusively by elevator constructors, it also requires that "[a]ll differences and disputes concerning Article IV . . . shall be settled in accordance with the grievance procedures in Article XV." Article XV requires that "[a]ny difference or dispute regarding the application and construction of this Agreement . . . shall be resolved under the following procedure. . . ." Finally and importantly, the NEBA Agreement prohibits Local 14 from engaging in a work stoppage over a dispute regarding the application of Article IV. You have already invoked the grievance procedure by asserting a grievance at the oral step, and Schindler is prepared to fulfill its obligations under the Article XV grievance procedures with respect to your grievance. Thus, Schindler demands that Local 14 and its members immediately cease and desist from any further refusal to work as directed. If Local 14 continues to violate the NEBA Agreement, Schindler will be forced to seek immediate and appropriate judicial relief.

Sincerely,

Peter Hall

cc:    Michael Langer (*via e-mail*)

- 2 -

# Exhibit H



## INTERNATIONAL UNION OF
## ELEVATOR CONSTRUCTORS LOCAL 14
3527 Harlem Rd., Suite 9
Buffalo, NY 14225

Phone: 716-833-5528 • Fax: 716-833-7426
E-mail: iueclocal14bflo@aol.com • web: www.buffalotrades.com



**Buffalo, New York**

February 21, 2012

Mr. Peter Hall
Schindler Elevator
80 Curtwright Drive Ste. 3
Williamsville, NY 14221

Dear Mr. Hall,

The purpose of this is to correct some of the inaccuracies of your letter dated February 17, 2012 referencing the 134 High Street MMTS job in Buffalo, NY.

Our original contact was on February 2, 2012. During that conversation you informed me that the general contractor had installed scaffolding in the hoistway for other crafts to use as there were hoistway issues. You then asked if Local 14 members could use that scaffold. At that time I informed you that the scaffold work, is the work of Local 14 members and your statement was "then we will have to do it without scaffolding". This statement is not from my memory but from my phone records of that date. From the best of my recollection at no time during that conversation did you advise me that Schindler employees would be using scaffolding <u>and</u> a temporary platform as your letter states.

On or about Wednesday February 8, 2012 we had our first conversation with regards to the overhead platform. At that time I stated that the work was also the work of Local 14 members and I still reiterate that. To date the overhead platforms of Schindler and all other signatory contractors for that matter have been done by us.

Your letter also states that you then provided the Local with a communication from a certified scaffolding inspector with regards to the safety of the equipment involved. As per the communication, I believe Mr. Pete Sidell identifies himself as the Safety Manager of LPCiminelli and at no time refers to himself as an OSHA certified scaffold inspector. You state that on the February 17, 2012 jobsite visit that I "inspected the scaffold and platform without expressing any concern about safety." That cannot be further from the truth as I never performed any such inspection and did not at any time even enter the hoistway. If what you witnessed is what Schindler Elevator considers an inspection then it was extremely lacking. Comments with regards to several members being on the bench



## INTERNATIONAL UNION OF
## ELEVATOR CONSTRUCTORS LOCAL 14

3527 Harlem Rd., Suite 9
Buffalo, NY 14225

Phone: 716-833-5528 • Fax: 716-833-7426
E-mail: iueclocal14bflo@aol.com • web: www.buffalotrades.com



Buffalo, New York

are also inaccurate as I believe you stated that "we (Schindler) just hired guys off your bench."

Finally, Local 14 and the members that I represent are well aware of the articles and procedures contained in the agreement between the union and Schindler Elevator. At no time would I direct any of my membership to be involved in an illegal activity and or ask them to break the agreement with which we have worked with for over one hundred years. I will however, do my best to make sure that everyone of them go home every evening.

Sincerely,

Donald M. Winkle Jr.
Business Representative
I.U.E.C. Local 14

# Exhibit I



**Schindler Elevator Corporation**

February 21, 2012

*Via Facsimile and U.S. Mail*

Mr. Donald M. Winkle, Jr.
International Union of Elevator Constructors
Local Union No. 14
3527 Harlem Road, Suite 9
Buffalo, NY  14225

Dear Don:

This follows up on our conversation of earlier this morning, and responds to your letter dated February 21, 2012.  While I appreciate you once again acknowledge Article XIV, the no-strike clause in the NEBA/IUEC collective bargaining agreement, it is clear that the IUEC and Local 14 are directing a concerted refusal to work in violation of that clause.  This morning, the Schindler Mechanic in Charge at the 134 High Street MMTS site told me that he and the other employees would refuse to work using the temporary work platforms.  The employee further advised that the employees agree that the temporary platforms are safe.  Indeed, he said that he knew the trades-people that constructed the platforms for LP Ciminelli and admitted that it would be an insult to suggest that the platforms are unsafe.  The employee went on to tell me that the employees hope that Schindler will file papers seeking injunctive relief immediately, so that this strike threat can be promptly resolved before employees miss work time.  These remarks demonstrate that the employees are ready and willing to work and have no safety concerns about working on the platforms.  Clearly, their only concern is being required to obey a union order to refuse to work.  It could hardly be more obvious that the IUEC and Local 14 are threatening to strike in an attempt to pressure Schindler into acceding to the Union's position with respect to a dispute that the Unions are supposed to process via grievance and arbitration.

I also advised you that Schindler has determined that it will not use the scaffolding to locate plumb lines or install brackets as earlier planned.   We would have expected the union to welcome this development.  Yet, you also continue to claim that constructing the temporary work platform is within the IUEC's exclusive work jurisdiction under NEBA Agreement.  This is simply not the case.  There is nothing in the NEBA Agreement that awards this work to the IUEC.  Moreover, Schindler has installed numerous 400A units nationwide including within Local 14's territory, using temporary work platforms provided by the General Contractor.  I reminded you of one such example this morning:  Schindler installed two 400A MRL elevators at the UMMC project in Batavia in 2011, where employees worked on temporary work platforms installed by the GC.  You said that you were not aware of that project.  While this statement is difficult to take at face value – insofar as you have been monitoring the few construction projects in our area and Local 14 requires its employees to report new construction assignments – it is also irrelevant.  Schindler has been installing 400A units for years using temporary work surfaces constructed by others.

80 Curtwright Drive, Suite 3
Williamsville, NY  14221-7055

Tel:  (716) 632-1463
Fax: (716) 632-1466
www.us.schindler.com



**Schindler**

Notwithstanding the foregoing, it is not necessary for Local 14 and Schindler to immediately resolve a dispute about whether constructing temporary work platforms is exclusively the IUEC's work. There is a process for resolving that dispute – the grievance and arbitration procedure found at Article XV of the NEBA Agreement. Indeed, you have requested and Schindler has agreed to designate our prior discussions as satisfying the Oral Step of the grievance procedure. Schindler stands ready to comply with all further steps in the grievance and arbitration procedure. At the same time, the IUEC and Local 14 are prohibited by Article XIV from engaging in concerted refusal to work. Schindler reiterates its demand that the IUEC, Local 14 and their members immediately cease and desist from any further refusal to work as directed,. If Local 14 continues to violate the NEBA Agreement, Schindler will be forced to seek immediate and appropriate relief.

Sincerely,

Peter Hall

cc:    Michael Langer (*via e-mail*)
       Mike Shields
       Joe Sena
       Jim Walker

- 2 -